EXHIBIT E

**AMERICAN ARBITRATION ASSOCIATION**®

**EMPLOYMENT ARBITRATION RULES
DEMAND FOR ARBITRATION**

To ensure your demand is processed promptly, please file online at www.adr.org/support. Complete this form, provide last known email addresses and include a copy of the Arbitration Agreement, Plan or Contract.

## Parties (Claimant)

| | | |
|---|---|---|
| Name of Claimant:  William H. Henrich, as Trustee of Insys Liquidation Trust | | |
| Address:  295 Madison Ave., 20th Floor | | |
| City:  New York | State:  New York | Zip Code:  10017 |
| Phone No.:  212-697-2400 | Email Address:  whenrich@getzlerhenrich.com | |
| Representative's Name (if known):  Eric D. Madden and Ryan Goldstein | | |
| Firm (if applicable):  Reid Collins & Tsai LLP | | |
| Representative's Address:  1601 Elm St., Suite 4200 | | |
| City:  Dallas | State:  Texas | Zip Code:  75201 |
| Phone No.:  214-420-8900 | Email Address:  emadden@reidcollins.com | |

## Parties (Respondent)

| | | |
|---|---|---|
| Name of Respondent:  Michael L. Babich | | |
| Address:  409 Eagle Bend Dr. | | |
| City:  Waxhaw | State:  North Carolina | Zip Code:  28173 |
| Phone No.:  Unknown | Email Address:  Unknown | |
| Representative's Name (if known):  Russell Piccoli | | |
| Firm (if applicable):  Russell Piccoli PLC | | |
| Representative's Address:  2646 E. Juniper Ave. | | |
| City:  Phoenix | State:  Arizona | Zip Code:  85032 |
| Phone No.:  602-381-0600 | Email Address:  rp@winazlaw.com | |

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange mediation, please check this box   .

Claim: What was/is the employee/worker's annual wage range? ☐ Less than $100,000  ☐ $100,000-$250,000  ☑ Over $250,000
*Note: This question is required by California law.*

Amount of Claim:  $175 million or more

Claim involves: ☐ Statutorily Protected Rights  ☐ Non-Statutorily Protected Rights

In detail, please describe the nature of each claim. You may attach additional pages if necessary:

The Trustee holds claims previously belonging to Insys Therapeutics, Inc. ("Insys"). The Trustee filed breach of fiduciary duty and other claims against Respondent Michael Babich ("Babich") in the Court of Chancery of the State of Delaware.  The claims are set forth in detail in Exhibit 1. Babich moved to compel arbitration pursuant to the arbitration clause contained in his separation agreement with Insys, attached as Exhibit 2. The Chancery Court granted Babich's motion, but did not reach the issue of whether the Trustee's claims are within the scope of the arbitration agreement. Accordingly, the Trustee files this arbitration pursuant to the Court's order, attached as Exhibit 3, but objects to the jurisdiction of the AAA to resolve the claims, and intends to seek dismissal pursuant to Rule 6(c).  ✚

**AMERICAN ARBITRATION ASSOCIATION**®

**EMPLOYMENT ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

Other Relief Sought: ☑ Attorneys Fees  ☑ Interest  ☑ Arbitration Costs  ☐ Punitive/ Exemplary

☑ Other:  Jurisdictional order declaring that the Trustee's claims are not subject to arbitration

Please describe the qualifications for arbitrator(s) to hear this dispute:

Former judge who has experience with issues of Delaware law.

Hearing: Estimated time needed for hearings overall:          hours  or  **3-5**          days

Hearing Locale:  **Phoenix, Arizona**

*(check one)* ☐ Requested by Claimant  ☑ Locale provision included in the contract

Filing Fee requirement or $350 (max amount per AAA)

Filing by Company: ☑ $2,450 single arbitrator  ☐ $3,050 three arbitrator panel

Notice: To begin proceedings, **please file online at www.adr.org/fileonline.** You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee.

| Signature (may be signed by a representative): | Date: |
|---|---|
| /s/ Eric D. Madden | December 8, 2023 |

Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. Only those disputes arising out of employer plans are included in the consumer definition. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the AAA's Western Case Management Center at 1-800-778-7879. If you have any questions regarding the waiver of administrative fees, AAA Customer Service can be reached at 1-800-778-7879. Please visit our website at www.adr.org/support to file this case online.

# EXHIBIT 1

**EFiled:  Jul 26 2023 05:09PM EDT**
**Transaction ID 70492683**
**Case No. 12696-JTL**

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| WILLIAM H. HENRICH, as Trustee of the Insys Liquidation Trust, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | C.A. No. 12696-JTL |
| JOHN N. KAPOOR, | : | |
| MICHAEL L. BABICH, | : | |
| PATRICK P. FOURTEAU, | : | |
| PIERRE LAPALME, STEVEN | : | |
| MEYER, BRIAN TAMBI, and | : | |
| THEODORE H. STANLEY, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## TRUSTEE'S AMENDED VERIFIED COMPLAINT

## TABLE OF CONTENTS

I.  NATURE OF ACTION ............................................................................1

II.  PARTIES .........................................................................................10

    A.  PLAINTIFF............................................................................10

    B.  DEFENDANTS ......................................................................10

III.  FACTUAL BACKGROUND..............................................................14

    A.  KAPOOR AND BABICH IMPLEMENT A CRIMINAL
       SCHEME. ...............................................................................14

        1.  Insys Develops Subsys, a Powerful Painkiller for Cancer
            Patients. ....................................................................14

        2.  Insys's Sale and Marketing of Subsys Is Heavily
            Regulated. .................................................................16

        3.  The Multifaceted Kapoor-Babich Scheme
            Is Implemented..........................................................17

            a.  The Sham "Speaker Program" to Disguise Bribes
                to Doctors........................................................ 18

            b.  The Effective-Dose Scheme to Increase Sales. ........... 27

            c.  The Insurance Fraud Scheme Involving the IRC. ......... 30

        4.  The Kapoor-Babich Scheme Culminates in Criminal
            Convictions. ..............................................................39

i

        a.      Kapoor, Babich, and Other Senior Management Are Convicted of Criminal Racketeering. ........................... 39

        b.      Other Insys Salesforce Members and Speaker-Program Physicians Are Convicted of Federal Crimes................ 43

        c.      Insys Resolves the DOJ's Criminal and Civil Claims, and Collapses into Bankruptcy. .................................... 46

B.    THE OUTSIDE DIRECTORS ENABLE THE CRIMINAL SCHEME WITH THEIR BAD-FAITH CONDUCT. ...........................47

    1.    Kapoor Handpicks the Outside Directors to Give Him Free Rein with the Company. ...........................................48

    2.    From the Launch of Subsys in March 2012, the Outside Directors Fail to Implement Any Compliance or Monitoring Programs. ................................................................52

    3.    From 2013 Onward, the Outside Directors Fail to Implement Any Meaningful Monitoring and Compliance Programs Despite More and More "Red Flags" of Possible Unlawful Behavior. ....................................................61

        a.      February 2013: The Board Learns of the IRC and Belatedly Adopts "Skeletal" Company Policies. .......... 61

        b.      July 2013: The Board Learns of Marketing Focused on "Effective Dose" and Receives Grave Warnings from the Part-Time Compliance Consultant. .................................................................. 63

        c.      December 2013: The Board Receives a Government Subpoena and Further Warnings from the Part-Time Compliance Consultant.................................................. 65

        d.      February 2014: The Board Receives a Limited Audit of the Speaker Program Identifying More Warning Signs. .......................................................... 69

e.  March 2014: The Board Allows Babich to Hire an Underqualified "Compliance Director"........................ 69

f.  Spring 2014: The Board Ignores Serious Concerns Expressed by a Fellow Director, Stanley. .................... 70

g.  May 2014: The Board Learns About Criminal Charges, a Scathing Media Report, and Additional IRC Problems.  ........................................................... 71

h.  June 2014: The Board Hears New Concerns Raised by the Compliance Director. .............................................. 75

i.  August 2014: The Board Hears Further Concerns from the Compliance Director, While an Internal Whistleblower Is Fired for Expressing Concerns.......... 76

j.  September 2014: The Board Receives a Criminal Subpoena Directed at the Company.  ........................... 78

k.  May 2015: The Board Begins Meeting More Often, But Accomplishes Little and Pays Themselves for Their Do-Nothing Troubles.  ........................................ 78

l.  June 2015: The Board Learns of a Guilty Plea Arising from the Company's Illegal Kickbacks............ 79

m.  July 2015: The Board Is Informed That Insys Lacks Effective Controls and Has Terminated Burlakoff........ 80

n.  August 2015: The Special Committee Finally Begins to Meet But Is Tainted, Ineffective, and Poorly Functioning. ................................................................. 81

o.  September to November 2015: The Board Terminates Babich as a Designated "Fall Guy." ............................. 83

p.  November 2015: The Board Defers to Kapoor's Decision to Install Himself as CEO. ............................. 86

q.    December 2016 to October 2017: The Board
Allows Kapoor to Remain on the Board Until
He is Indicted. ............................................................... 87

C.    THE CRIMINAL SCHEME DAMAGES AND DESTROYS
INSYS. ........................................................................88

D.    BABICH ENGAGES IN INSIDER TRADING. ...................................92

IV.    CAUSES OF ACTION...................................................................95

COUNT I
Breach of Fiduciary Duties (Against Kapoor)................................95

COUNT II
Breach of Fiduciary Duties (Against Babich) ...............................97

COUNT III
Breach of Fiduciary Duties (Against the Outside Directors) .......................99

COUNT IV
Corporate Waste (Against All Defendants)...................................102

COUNT V
Brophy Claim (Against Babich)..................................................103

COUNT VI
Unjust Enrichment (Against Babich) ..........................................104

V.    PRAYER FOR RELIEF ..............................................................104

William H. Henrich, in his capacity as Liquidating Trustee (the "Trustee") of the Insys Liquidation Trust (the "Trust") under the confirmed Chapter 11 Plan for Insys Therapeutics, Inc. ("Insys"), hereby files this Amended Verified Complaint, and alleges as follows.

## I.   NATURE OF ACTION

1.     In this action, the Trustee seeks to hold Insys's former directors and officers accountable for the crippling consequences that the company suffered due to their shocking malfeasance.  That misconduct exposed Insys to hundreds of civil and criminal actions involving billions of dollars in third-party claims, driving the company into bankruptcy in June 2019.

2.     Insys was a specialty pharmaceutical company that developed, sold, and marketed a highly addictive and inherently dangerous fentanyl spray, SUBSYS® ("Subsys").  Fentanyl—a synthetic opioid that is 50 times more powerful than heroin and 100 times more powerful than morphine—is a Schedule II controlled substance with high potential for abuse and dependence.  The U.S. Federal Drug Administration ("FDA") approved Subsys solely for treatment of cancer patients suffering persistent pain that was not ameliorated by other prescription pain medications, referred to as "breakthrough" pain.

3.     Shortly after Subsys was launched for commercial sale in March 2012, Insys's founder, chairman, and controlling stockholder, John D. Kapoor ("Kapoor")

1

and the protégé whom he installed as the company's CEO, Michael Babich ("Babich"), implemented an unlawful scheme to sell and market Subsys. Their illicit scheme was pervasive and multi-faceted, but it involved three primary components.

4.      The first major component of the Kapoor-Babich unlawful scheme involved bribing doctors to write an increasingly greater number of Subsys prescriptions, even where not medically appropriate or necessary. The bribes were made under the pretense of being "speaker fees" as part of a "speaker program," in which doctors supposedly were to extoll the virtues of Subsys to other doctors. But in reality, the speaker program was a sham from the start. Doctors were paid speaker fees for events that they never attended, and their fees were directly tied to the number of prescriptions that they wrote. Shockingly, Kapoor and Babich even directed Insys personnel to create a return on investment, or "ROI," analysis, to monitor the number of prescription "bangs" for the amount of speaker fee "bucks." And Kapoor and Babich made sure that doctors who did not live up to their end of the corrupt, *quid pro quo* bargain were excluded from further participation in the so-called "speaker program."

5.      The second major component of the Kapoor-Babich criminal scheme involved directing Insys's salesforce to pressure doctors into writing prescriptions for stronger doses of Subsys than medically indicated (because higher-strength doses were more lucrative for the company). Babich, with Kapoor's blessing, instructed

2

Insys's salesforce to pressure doctors to write stronger prescriptions, and tied their bonuses to the strength of prescriptions written, known as the "effective dose." This marketing strategy of increasing the strength of dose, referred to as "titration," was so pervasive that the company played a satirical rap video at its national sales meeting in which Insys salesmen—wearing tuxedos with sunglasses and dancing alongside a person in a Subsys canister costume—boasted about the practice, rapping: "I love titrations. Yeah, that's not a problem."

6.      The third major component of the Kapoor-Babich illicit scheme was to defraud third-party insurers (in addition to governmental payors) into covering the costs of medically unnecessary or otherwise unlawful Subsys prescriptions. Kapoor and Babich oversaw the creation of Insys's in-house department, referred to as the "insurance reimbursement center" or "IRC," to facilitate authorizations from insurance carriers for Subsys prescriptions (regardless of medical need). Insys employees were instructed to fill out necessary insurance paperwork for prescribing doctors, and then to converse by telephone with insurers without indicating their Insys affiliation and while delivering carefully crafted—and fraudulent—scripted answers to questions that insurers might ask. The so-called "spiel" that Insys employees were instructed to follow was discussed widely among Insys management, and Kapoor himself personally participated in drafting different versions of the "spiel."

7.     Given its pervasive and systemic nature, the Kapoor-Babich scheme did not remain hidden, and it sparked a series of whistleblower complaints, government investigations, media reports, and criminal prosecutions of Insys employees and corrupt doctors.  Eventually, in October 2017, Kapoor and Babich were criminally indicted in a superseding indictment for violating 18 U.S.C. § 1962(d) (racketeering conspiracy), 18 U.S.C. § 1349 (mail fraud conspiracy and wire fraud conspiracy for scheme to defraud insurers), and 18 U.S.C. § 371 (conspiracy to violate the Anti-Kickback Statute) in *United States v. Babich et al.*, No. 16-CR-10343 (D. Mass.) (the "Criminal Action").

8.     The Criminal Action confirmed the illegality of the Kapoor-Babich scheme.  On January 9, 2019, Babich pleaded guilty to conspiracy to commit mail fraud and wire fraud (18 U.S.C. § 307) and to mail fraud (18 U.S.C. § 1341).  On May 12, 2019, following a lengthy criminal trial at which Babich and others testified over the course of many days, Kapoor was convicted for violating the federal RICO statute (18 U.S.C. § 1962(d)) by devising a scheme to bribe doctors to prescribe Subsys and to defraud insurers to cover the prescription costs.  Kapoor's landmark conviction for criminal racketeering was subsequently affirmed by the U.S. Court of

Appeals for the First Circuit in a blistering 141-page opinion.[1]

9.      By June 2019, at least eight high-ranking Insys executives—including its Chairman (Kapoor) and CEO (Babich)—had been criminally convicted.  The company therefore waived the white flag.  On June 5, 2019, Insys agreed to pay $225 million to settle the federal government's civil and criminal investigations, with the company's wholly owned subsidiary pleading guilty to mail fraud.  Just five days later, Insys collapsed into bankruptcy.

10.      All told, the vast criminal scheme perpetrated by Kapoor and Babich generated dozens of criminal convictions of former Insys executive and employees, and corrupt Subsys-prescribing doctors.  Insys itself has faced dozens of government investigations, enforcement actions, and criminal and civil proceedings, and hundreds of civil suits collectively seeking billions of dollars.  Consequently, Insys has been oft-described in media reports as the "poster child" of a pharmaceutical company plagued by wrongful opioid sales and marketing practices.

11.      None of the shocking malfeasance that befell Insys would have been

---

[1] The First Circuit, for example, stated: "The facts of this mammoth case . . . tell a chilling tale of suffering that did not need to happen.  It involves a group of pharmaceutical executives who chose to shunt medical necessity to one side and shamelessly proceeded to exploit the sickest and most vulnerable among us—all in an effort to fatten the bottom line and pad their own pockets." *United States v. Simon et al.*, 12 F.4th at 1, 15 (1st Cir. 2021).

possible had it not been for the total failures by Insys's board of directors to implement any sort of compliance or monitoring function at the company. Indeed, Insys's directors turned a blind eye to known risks, known regulatory compliance obligations in the pharmaceutical industry, the inherent risks involved in the sale and marketing of opioids (and a notoriously dangerous one, in fentanyl, at that), and numerous "red flags" of potential compliance issues brought to their attention. Again and again, Insys's directors failed to act in good faith to implement even the most minimal safeguards against illegality, or to ensure that the few token gestures they did take were implemented effectively, as the following examples illustrate.

12.     First, Insys's directors failed to implement any internal audit function, to hire any full-time regulatory compliance personnel, or to hire in-house legal counsel until 2014, long after the Subsys launch in early 2012 and implementation of the Kapoor-Babich unlawful sales and marketing scheme.

13.     Second, although Insys's directors retained a part-time compliance consultant, they ignored his specific recommendations to ensure that the company's sales and marketing practices were lawful. The directors did not request or receive any information from this consultant until a July 2013 board meeting. At that board meeting, the consultant specifically advised the board that Insys needed to hire a full-time general counsel and compliance officer given the inherent risks in selling Subsys and his observations about concerning promotional and reimbursement

practices.  The consultant also stressed the need to conduct an internal audit both of the "speaker program" and of the IRC.  But Insys's directors ignored those recommendations.

14.    Third, Insys's directors failed to implement any board-level compliance monitoring, any regular processes or protocols for management reports to the board on compliance issues, or any internal reporting system through which employees could bring compliance concerns to the board's attention.

15.    Fourth, Insys's directors failed to implement compliance initiatives even upon receiving a federal governmental subpoena in December 2013 that indicated a possible whistleblower regarding Insys's ongoing practices.  Shortly after receiving the subpoena, Insys's directors held a board meeting at which the part-time compliance consultant reiterated his concerns regarding possible systemic unlawful activity related to the speaker program.  Although the directors formed a special committee to explore compliance issues, the special committee did absolutely nothing until over eighteen months later (in August 2015).  And even when the special committee re-constituted itself and finally started to meet, it was not independent or well-functioning; Kapoor himself was present at many special committee meetings and continued to steer the company's actions from outside the special committee framework.

16.    Fifth, in early 2014, the only Insys director without any financial

entanglements or prior business relationships with Kapoor expressed concerns to his fellow board members that the board was "turning a blind eye" to potential unlawfulness and the concerns raised by Insys employees over the speaker program (and in particular, the ROI analysis seeking to quantify the effectiveness of *quid pro quo* payments).  Yet Insys's directors did nothing.

17.    <u>Sixth</u>, Insys's directors failed to take any action in response to glaring "red flags" of possible illegality that came to their attention beginning in May 2014. Early that month, the leading Subsys prescriber in the entire country was charged with health care fraud and Controlled Substance Act violations.  Just five days after Insys's directors were informed of that arrest, *The New York Times* published an article noting that "questions are emerging about how [Subsys] is being sold, and to whom."  Once again, however, Insys's directors brushed off the concerns raised as isolated issues and did nothing to investigate or to ensure that misbehaving salesforce members were not pushing Subsys to be prescribed inappropriately.

18.    <u>Seventh</u>, Insys's directors failed to act in response to concerns expressed in a June 2014 board meeting by a recently hired compliance director for the company.  Although this compliance director had no prior pharmaceutical industry experience and was relatively young and inexperienced, it was obvious even to her that the IRC's practices were inappropriate.  At a June 2014 board meeting, this compliance director specifically informed Insys's directors that she believed that

the IRC was committing insurance fraud.  Yet Insys's directors brushed off her concerns and failed to take any investigatory or monitoring efforts to ensure that the IRC was operating appropriately.

19.    <u>Eighth</u>, Insys's directors failed to perform any investigation when Kapoor and Babich retaliated against an internal whistleblower by firing him in August 2014.  The board was informed of the firing, and that it had been at the direction of Kapoor and Babich.  But the board did absolutely nothing to explore the surrounding circumstances, which would have revealed Kapoor's implementation of the ROI analysis of bribes paid to doctors in the "speaker program."

20.    <u>Finally</u>, Insys's directors failed to implement investigatory or monitoring initiatives even when the company itself received a federal criminal subpoena in September 2014.

21.    In sum, Insys's directors did nothing to ensure that the company complied with applicable laws in its strictly regulated, high-risk industry, even after "red flags" of possible unlawful activity were brought to their attention.  Instead, they stood back and let Kapoor run Insys as he saw fit—even when that entailed misguided efforts to try to shield Kapoor from criminal liability as his subordinates were criminally charged from 2015 through 2017.  Insys's directors did not act in good faith in carrying out their duties of care as directors, nor did they act in what they subjectively believed to be in Insys's best interests.  Rather, they were enablers

who, motivated by their relationships with and loyalty to Kapoor, gave him carte blanche to author one of the darkest chapters of the opioid crisis.

## II.   PARTIES

### A.   PLAINTIFF

22.    The Trust is a Delaware statutory trust.  The Trust was created, and the Trustee was appointed, pursuant to an order by the U.S. Bankruptcy Court for the District of Delaware confirming the Chapter 11 plan of liquidation (the "Plan") in Insys's bankruptcy case.[2]  Under the Plan, certain claims and causes of action belonging to Insys, including the claims asserted in this action, were vested in the Trust for prosecution by the Trustee as a representative of the bankruptcy estate pursuant to 11 U.S.C. § 1123(a)(5), (a)(7), and (b)(3)(B).  The Trustee, therefore, has standing to pursue the claims asserted in this action.  On May 11, 2021, the Court granted the Trustee's Motion to Realign and Substitute Party in this action and substituted the Trustee as the plaintiff to pursue claims formerly brought derivatively on behalf of Insys.

### B.   DEFENDANTS

23.    Defendant John N. Kapoor ("Kapoor") is the founder of Insys.  He served in the following positions at Insys: (a) as a member of its board of directors

---

[2] *In re Insys Therapeutics, Inc., et al.*, Case No. 19-11292 (Bankr. D. Del.).

from its formation until October 2017; (b) as Executive Chairman from June 2006 to October 2017; and (c) as President and Chief Executive Officer from November 2015 to January 2017.  Kapoor holds a doctorate in medical chemistry from the University of Buffalo.  On May 2, 2019, Kapoor was convicted by a jury for engaging in a racketeering conspiracy (18 U.S.C. § 1962(d)) with other Insys executives.  Kapoor was sentenced to 66 months in prison followed by three years of supervised release.  His conviction was subsequently affirmed by the U.S. Court of Appeals for the First Circuit.  Kapoor is currently serving his prison sentence.

24.    Defendant Michael L. Babich ("Babich") served in the following positions at Insys: (a) as a member of its board of directors from 2008 to November 2015; (b) as President from November 2010 to November 2015; and (c) as Chief Executive Officer from March 2011 to November 2015.  He also served as the Chief Operating Officer and as a member of the board of directors for Insys Pharma, Inc. ("Insys Pharma"), a wholly owned subsidiary of Insys, from March 2007 to November 2010.  Before joining Insys, Babich worked closely with Kapoor at EJ Financial Enterprises Inc. ("EJ Financial"), a venture capital firm controlled by Kapoor.  Babich began working for EJ Financial in 2001, at the age of 25, and became close with Kapoor.  Kapoor paid for Babich's pursuit of an MBA degree during his time at EJ Financial.  Following Babich's receipt of an MBA in 2007, Kapoor hired him at Insys Pharma.  Kapoor later installed Babich as CEO of Insys

in March 2011. On January 9, 2019, Babich pleaded guilty to one count of conspiracy to commit mail fraud and wire fraud (18 U.S.C. § 307) and one count of mail fraud (18 U.S.C. § 1341). Babich was sentenced to 30 months in prison followed by three years of supervised release. Babich has finished serving his prison sentence.

25.    Defendant Patrick P. Fourteau ("Fourteau") served as a member of Insys's board of directors from March 2011 to October 2017. He also served as a member of Insys Pharma's board of directors from August 2007 to November 2010. From 2003 to 2008, Fourteau served as President and Chief Executive Officer of Sciele Pharma, Inc. ("Sciele"), a company that Kapoor founded and controlled. Fourteau also served as a member of Sciele's board of directors—along with Kapoor and Defendant Pierre Lapalme—from 2004 to 2008.

26.    Defendant Pierre Lapalme ("Lapalme") served as a member of Insys's board of directors from March 2011 to June 2019. He also served as a member of Sciele's board of directors—along with Kapoor and Fourteau—from 2000 to 2008.

27.    Defendant Steven Meyer ("Meyer") served in the following positions at Insys: (a) as Chairman of its board of directors from January 2017 to June 2019; and (b) as a member of its board of directors from November 2010 to June 2019. He also served as a member of Insys Pharma's board of directors from August 2007 to November 2010. Meyer—along with Kapoor and Defendant Brian Tambi—also

served as a member of the board of directors of Akorn, Inc. ("Akorn"), another pharmaceutical company in which Kapoor held a substantial ownership interest, from 2009 to 2020.

28.    Defendant Brian Tambi ("Tambi") served as a member of Insys's board of directors from November 2010 to May 2018.  From August 2007 until November 2010, Tambi served as a member of Insys Pharma's board of directors.  Tambi— along with Kapoor and Meyer—also served as a member of Akorn's board of directors from 2009 to 2020

29.    Theodore Stanley ("Stanley") served as a member of Insys's board of directors from March 2013 to July 2017, when he passed away at the age of 77 after this action was commenced.  The Trustee is no longer pursuing claims against Stanley or his estate.

30.    As members of Insys's board of directors during the relevant period, Kapoor, Babich, Fourteau, Meyer, Lapalme, and Tambi are collectively referred to as the "Defendants."  Because they did not serve as Insys's officers at any point (unlike Kapoor and Babich), Fourteau, Meyer, Lapalme, and Tambi are collectively referred to as the "Outside Directors."

13

## III.   FACTUAL BACKGROUND

## A.   KAPOOR AND BABICH IMPLEMENT A CRIMINAL SCHEME.

### 1.   Insys Develops Subsys, a Powerful Painkiller for Cancer Patients.

31.   Insys was a specialty pharmaceutical company in the business of developing and marketing novel pharmaceutical products.  Its most promising—and only commercially significant—product was Subsys, which Insys launched for sale in March 2012.  Subsys helped alleviate pain suffered by cancer patients when less powerful painkilling medications failed, a pain known as "breakthrough" pain.  It did so by administering a synthetic opioid called fentanyl through an under-the-tongue (sublingual) spray.

32.   Subsys has a novel delivery system.  Upon its launch, Subsys was the sixth product in a specific class of drugs which administer fentanyl through mucus membranes.  That class of drugs is technically referred to as the Transmucosal Immediate-Release Fentanyl ("TIRF") class.  Among TIRF drugs, Subsys was the first-ever sublingual spray.

33.   Subsys is a strong pain suppressant.  Its primary chemical compound, fentanyl, is quite potent—50 times more powerful than heroin and 100 times more powerful than morphine.  As such, it is classified as a Schedule II controlled substance with high potential for abuse and dependence.  And when fentanyl is

14

released into mucus membranes, as through TIRF drugs like Subsys, its potency is enhanced by a rapid release of the opioid into the patient's bloodstream.

34.     Based on the unique delivery system and high potency of Subsys, the FDA recognized its inherent potential for abuse and overdose. Specifically, in January of 2012, the FDA approved Subsys for commercial sale while also limiting the purposes and manner for which Subsys could be prescribed.

35.     The purposes for which the FDA approved Subsys were narrow. Subsys was permitted only for the management of breakthrough pain in adult cancer patients who were already receiving and tolerant to around-the-clock opioid therapy. Under 21 U.S.C. § 301 *et seq.* and 42 U.S.C. § 262 *et seq.* and their implementing regulations, Insys was permitted to market Subsys only for this specific, on-label use. Subsys was expressly <u>not</u> permitted (*i.e.* contraindicated) for use in the management of acute or postoperative pain, headaches or migraines, and dental pain.

36.     The strength of the doses in which Subsys could be prescribed was also constrained by the FDA. "The initial dose of SUBSYS to treat episodes of breakthrough cancer pain" was "always" to be 100 mcg—the smallest available dose. And doctors seeking to increase a patient's dose strength could do so only under limited circumstances. As a prerequisite, physicians had to find that the current dose failed to treat the breakthrough pain episode adequately for several

consecutive episodes.  If that were so, physicians were permitted to prescribe only the next tiered dose.

### 2.    Insys's Sale and Marketing of Subsys Is Heavily Regulated.

37.    Insys sold Subsys within a heavily regulated industry for controlled substances and the sale of pharmaceutical products.  As such, Insys was subject to extensive statutes and regulations, at both the state and federal level, applicable to the manufacturing, sale, and marketing of Subsys.  Compliance with all such laws was mission critical for Insys to succeed in its business model.  Insys's sale and marketing of Subsys was subject to at least three, well-known statutory and regulatory regimes.

38.    First, under the False Claims Act, "any person" incurs civil liability for knowingly presenting or causing to be presented to the federal government a "false or fraudulent claim for payment or approval."  31 U.S.C. § 3729.  The law attaches similar liability for any person who knowingly makes, uses, or causes to be made or used, a material "false record or statement" related to a false or fraudulent claim.  *Id.* Parallel state laws prohibit similar conduct.

39.    Second, under the federal Anti-Kickback Statute, it is unlawful for a drug manufacturer to bribe doctors to sell its drug (or for a doctor to accept such a bribe).  That is, it is illegal for anyone to offer, make, or accept payment pr other remuneration in exchange for the referral of any product for which payment is sought

from any federal healthcare program.  42 U.S.C. § 1320a-7b(b).  A violation of the Anti-Kickback Statute can result in civil or criminal liability.  And under the Patient Protection and Affordable Care Act, a violation of the Anti-Kickback Statute is a false claim for purposes of the False Claims Act.

40.    Third, various federal statutes and regulations make it illegal for drug companies to market drugs for "off-label" use.  As described above with Subsys, the FDA approves drugs for specific uses (called "indications").  Although doctors may legally prescribe drugs outside of their approved indications, it is illegal for manufacturers to market a drug for off-label indications.  *See, e.g.*, 21 U.S.C. §§ 301 *et seq.*; 42 U.S.C. §§ 262 *et seq.*, 21 U.S.C. § 331(a), (d); 42 U.S.C. § 262(a)(1), (b); 21 C.F.R. § 601.12.

41.    Even though these statutory and regulatory limitations are well-known within the pharmaceutical industry, Kapoor and Babich implemented a pervasive criminal scheme that flagrantly violated these and other legal limitations.

### 3.    The Multifaceted Kapoor-Babich Scheme Is Implemented.

42.    Soon after Subsys was launched in early 2012, Kapoor and Babich implemented their multifaceted criminal sales and marketing scheme.  They did so because Subsys's lackluster initial results—panned by Kapoor as the *"worst f[***]ing launch in pharmaceutical history"*—were inadequate to satiate their greed.  Kapoor and Babich demanded that sales increase at all costs, regardless of

the legality of methods or the harm inflicted on the public and Insys itself. The pervasive scheme they devised to criminally and fraudulently increase Subsys revenues involved three primary components: (1) a "speaker program" to mask bribes to doctors; (2) deployment of a corrupt Insys salesforce to pressure doctors to write medically inappropriate prescriptions for stronger doses, referred to as the "effective" doses, and (3) development of an in-house insurance fraud program, the IRC.

      **a.**      <u>**The Sham "Speaker Program" to Disguise Bribes to Doctors.**</u>

43.    In August 2012, Kapoor and Babich launched a "speaker program" designed to induce doctors to write more Subsys prescriptions by offering them bribes in the form of "speaker fees" and other perks, tied *quid pro quo*, to the number of prescriptions written by those doctors (the "<u>Speaker Program</u>"). On paper, the Speaker Program was a peer-to-peer educational program through which doctors and other medical providers would share their experiences prescribing Subsys with other potential prescribers. But in reality, the Speaker Program was a way for Kapoor, Babich, and the salesforce they installed to funnel bribes to prescribing doctors through "speaker fees" that totaled thousands of dollars per event. The speaking events were merely a pretense for the Speaker Program's true purpose: to put money in the pockets of prescribers in exchange for their willingness to prescribe more Subsys to their patients, regardless of medical necessity.

44.     Four aspects of the Speaker Program reflect that it was not a genuine marketing effort, but rather an utter farce designed to disguise what amounted to illegal kickbacks to doctors.  <u>First</u>, the Speaker Program paid out exorbitant benefits to doctors that were tied to the number of Subsys prescriptions written by the participating speakers themselves, not by their audience members (reflecting that building brand awareness was not the real motive).  <u>Second</u>, Kapoor and Babich implemented a tracking program to quantify and correlate the amount of money paid to doctors in speaker fees and their Subsys prescriptions—a "return on investment" or "ROI" analysis.  <u>Third</u>, Kapoor and Babich ensured that their underlings and corrupt salesforce representatives intentionally targeted top "performing" doctors in the Speaker Program who wrote the most Subsys prescriptions—doctors to whom they referred as "whales."  <u>Fourth</u>, Kapoor and Babich consciously sought out subordinate officers and salesforce foot soldiers who would implement the Speaker Program, despite its flagrant illegality.

45.     <u>First</u>, the Speaker Program paid out exorbitant benefits that were directly tied to the number of Subsys prescriptions written by the participating doctor, and not some metric related to building brand awareness.  Doctors prescribing Subsys could earn over $100,000 or more per year in bribes disguised as so-called "speaker fees," regardless of whether anyone attended their purported speaking events or whether or not the events were even held.  In addition, speakers

were lavished with expensive meals, drinks, and travel reimbursements, as inducements to write more prescriptions. The cash "speaker fees" and other perks were not tied to building brand awareness, as no analysis was performed on prescriptions written by attendees. Rather, payments and other benefits provided to doctors were dependent on the number of prescriptions written by the supposedly speaking doctors. In fact, salesforce representatives expressly required doctors to write a minimum number of Subsys prescriptions to continue to receive the "speaker fee" bribes and kickbacks.

46. Further reflective of the sham and illegitimate nature of the Speaker Program, the Insys salesforce falsified attendance records, listed inappropriate attendees and venues, and posted excessive costs. Indeed, salesforce members were specifically instructed that participating doctors who were leading prescribers, like Dr. Gavin Awerbuch (arrested in 2014), should be paid regardless of whether they attended events or gave speeches.

47. None of this was by accident, and Kapoor himself made clear to the company's Executive Vice President of Sales, Alec Burlakoff ("Burlakoff"), that the true purpose of the Speaker Program was to line doctor's pockets as a *quid pro quo* for more Subsys prescriptions. Burlakoff testified in the Criminal Action that, in September 2012, he had a "detailed conversation" with Kapoor and Babich in which "their objectives were once again reiterated to [Burlakoff]—they made sure that

there was no way that [he] could mistake their message" that "paying the doctors w[ould] result in an increase in prescriptions."

48.     Following that conversation, and in order to convey Kapoor's message, Burlakoff sent an email to the entire Insys salesforce (with Kapoor blind-copied) regarding the Speaker Program.  Burlakoff specifically instructed the salesforce: "If you cannot guarantee that this program will yield positive results [*i.e.*, speakers producing prescriptions], the program should not take place."

49.     <u>Second</u>, Kapoor and Babich instructed their underlings to quantify and track whether doctors participating in the Speaker Program were living up to their end of the corrupt bargain and writing more Subsys prescriptions in exchange for the payments they received.   In September 2012, Kapoor directed Matthew Napoletano ("<u>Napoletano</u>"), the company's Vice President of Marketing, to analyze the ratio of expenditure to revenue from each speaker's prescriptions of Subsys (the "<u>ROI Analysis</u>").  Napoletano understood that Kapoor wanted a 2:1 ratio.  That is, Kapoor demanded that for every dollar that Insys spent on a particular speaker, it must generate two dollars of revenue from Subsys prescriptions written directly by that speaker.  The ROI Analysis was focused purely on a *quid pro quo* return in prescriptions from the speaking doctors themselves, and not on any general increase in market share due to enhanced brand awareness.

50.    Napoletano initially objected to Kapoor's demand to prepare and maintain the ROI Analysis.  At meetings with Kapoor that included Babich and Burlakoff, Napoletano stated that, based on the "pharma code" and certain "statutes," "[e]verybody knows that you don't track speakers."  Napoletano was so impassioned about the topic that at one meeting he dared to yell at Kapoor, screaming his dissent to conducting the analysis.  The meeting ended with Napoletano fearing for his job.

51.    Shortly thereafter, Napoletano ceded to Kapoor's demands to avoid getting fired.  Specifically, Napoletano sent a presentation to Babich and Burlakoff on December 10, 2012, with a cover email stating, "let's discuss if this is what we want to share with [Kapoor] tomorrow . . . ."  The presentation was entitled "Speaker Bureau Assessment," and explicitly calculated the return on investment for the Speaker Program.  That is, for each individual physician in the program, it compared the fees paid to that doctor with the net revenue he/she had personally generated by writing Subsys prescriptions.  Two days later, Napoletano emailed Babich and others the same presentation (along with a second entitled "2013 Proposed Marketing Budget") in an email with a single line of text: "To send to [Kapoor] . . ."  The attachments included slides analyzing "Speaker ROI," explained that speakers with less than 2:1 ROI had been "flagged," and identified candidates to "soft delete" from the Speaker Program.

52.     After sending that email intended for Kapoor, Napoletano met with Kapoor, Babich, and Burlakoff to review the ROI Analysis presentation.  As Babich testified in the Criminal Action, at that meeting they assessed each doctor, line by line, to determine what they should do with certain speakers going forward based upon the revenue generated.

53.     Despite his obedience to Kapoor, Napoletano continued to express discomfort with performing the ROI Analysis to Babich.   Babich testified that Napoletano was in Napoletano's "*office screaming that we're all going to go to jail*, that he should have never ran the return on investment report."   Ignoring Napoletano's desperate warnings, Babich told him to keep performing the analysis because it was what Kapoor wanted.

54.     Third, Kapoor and Babich directed and ensured that the Insys salesforce targeted top performing physicians in the Speaker Program.  With the blessing of Kapoor and Babich, Burlakoff instructed the salesforce to give speaker programs to high prescribers and "hold them accountable" for prescribing more Subsys in exchange for Speaker Program payments.   The salesforce (and management) referred to these high prescribers as *"whales."*  Babich bluntly testified that whales were *"the physicians that we knew that, if you gave them money, their scripts would go up."*

55.     Kapoor, Babich, Burlakoff, and others frequently discussed the productivity of whales on management calls, which occurred at 8:30 a.m. each day.

56.     Babich testified in the Criminal Action that:

> *[Kapoor] bought into the fact that we should target these whales* . . . . Because remember at the end of *the day the goal was to get money in the hands of physicians any way possible, and it was a cheaper way to do it*.

The prosecutor then asked: "I want you to be crystal clear about this.  Mr. Babich, when you're talking about getting money into the hands of doctors, what are you referring to?"  Babich responded: ***"To bribe them to write the product."***

57.     Because the true goal of the Speaker Program was bribery (not education), the salesforce was specifically instructed not to be concerned with whether physicians were qualified to speak about Subsys in an educational setting. For example, Babich forwarded to Burlakoff an email summarizing a salesforce member's interactions with Dr. Paul Madison, a high prescriber and participant in the Speaker Program: "Dr. Madison runs a *very shady pill mill and only accepts cash*. . . .  He basically *just shows up to sign his name on the prescription pad*, if he shows up at all . . . . I call on him frequently."  Burlakoff then instructed the salesforce member to "make good on our commitment to utilize Dr. Madison as a *Subsys thought leader*" with speaking programs "as much as once a week."

58.     And when doctors receiving speaker fees did not write enough prescriptions, salesforce members were instructed to proactively challenge those

24

doctors to write more prescriptions or even drop them from the Speaker Program. Such exclusions began even early on in the Speaker Program. For example, on November 9, 2012, Babich emailed Burlakoff and Napoletano that Dr. Steve Fanto—another high-decile prescriber of Subsys—*"needs to start crankin or he gets taco bell."*

59.   <u>Fourth</u>, Kapoor and Babich implemented the illicit Speaker Program through conscious hiring decisions to bring in unscrupulous, financially desperate, and/or sufficiently inexperienced or unsophisticated salesforce employees who would partake in the flagrantly wrongful behavior that the Speaker Program entailed. Kapoor and Babich referred to such salesforce minions hired to implement their scheme as "PHDs," standing for *"poor, hungry and driven."*

60.   To assist in hiring and leading the "PHD" salesforce members, Kapoor and Babich turned to Burlakoff. Kapoor and Babich hired Burlakoff in 2012 after he specifically told them, during his job interview, of a similar sham speaker program to bribe doctors that Burlakoff had employed when he had worked as one of the top salespeople at Cephalon, Inc. ("<u>Cephalon</u>"). Cephalon's illegal marketing tactics resulted in a $425 million settlement with the federal government in 2008. Despite their knowledge of Burlakoff's prior involvement in these illegal tactics, Kapoor and Babich hired Burlakoff because his experience made him a perfect fit for spearheading the illicit Speaker Program that they hoped to implement at Insys.

61.    Not long after hiring Burlakoff, Babich and Kapoor promoted him to Vice President of Sales in September 2012.  That promotion followed Burlakoff's success in implementing a "pilot program" of the Speaker Program in Insys's southeast region as a regional sales manager, and a business plan that he prepared for Kapoor and Babich that emphasized the need to focus on ROI analysis for the Speaker Program and building a sales team "upon a 'win at all cost' foundation."

62.    Upon Burlakoff's promotion, Kapoor and Babich directed Burlakoff to build his "win at all cost" sales team.  Burlakoff zealously followed those orders, hiring a slew of regional and district sales managers and sales associates who were the right sort of people for the dirty job.  Consistent with the guidance and direction from Kapoor and Babich, Burlakoff specifically recruited people he believed would be willing and capable of taking part in illicit sales tactics, including improper payments and perks provided to physicians through the Speaker Program.

63.    One of the first regional sales managers that Burlakoff hired was Sunrise Lee ("Lee"), an exotic dancer whom Burlakoff first met at a strip club. Burlakoff said he recruited Lee because she was a "great listener" and "more of a 'closer.'"  Because Lee lacked pharmaceutical experience and a college education, Burlakoff helped Lee falsify her resume to obtain the job at Insys.

64.    Burlakoff also recruited employees from his former employer, Cephalon.  He did so because he knew they would be willing and well-equipped to

26

help execute the illegal Speaker Program.  Between 2013 and 2016, Burlakoff recruited at least 15 employees from Cephalon to join Insys.  And Kapoor and Babich also hired personnel from Cephalon.  For instance, they hired Joseph Rowan ("Rowan") from Cephalon as a district manager because, during his time as a sales representative at Cephalon, Rowan developed a "tremendous" relationship with a massive "pill mill" operator in Mobile, Alabama.

65.    In short, the illegality surrounding the Speaker Program was not the result of random acts by a handful of "bad apple" employees gone rogue.  Rather, Kapoor and Babich deliberately implemented all aspects of the program, hired Burlakoff to help spearhead it because of his prior experience in executing a similar illegal speaker program at Cephalon, and ensured that Insys staffed its salesforce with "poor, hungry, and driven/dumb" individuals who would heedlessly execute the Speaker Program despite the flagrant illegality it entailed in exchange for bonuses.

### b.    The Effective-Dose Scheme to Increase Sales.

66.    A salesforce made up of "PHD" members also executed the second major component of the Kapoor-Babich scheme, dubbed the effective-dose strategy, through which doctors were pressured to write prescriptions for stronger doses of Subsys than medically indicated (or permitted under the FDA-approved prescribing parameters for Subsys).  Kapoor and Babich implemented the effective-dose strategy

despite its illegality (and the physical risks it posed to patients) because Insys was paid far more for higher strength doses of Subsys (*e.g.*, 1200 mcg and 1600 mcg) than for lower strength doses (*e.g.*, 100 mcg).

67.   Kapoor and Babich implemented the effective-dose strategy starting in mid-2012.   By July 2012, Babich was sending salesforce-wide emails informing them that the five salesforce representatives with the highest number of prescriptions for 600 mcg or stronger would receive extra cash bonuses.   And in August 2012, Kapoor and Babich made clear that pressuring doctors to prescribe higher strength doses was an imperative for the salesforce.   On August 29, 2012, Kapoor emailed Babich, Napoletano, and others: ***"[W]e need to move patients to higher doses*** from 100mcg . . . . We will monitor on a daily basis, based on the report from Sean [Yu, the Vice President, Business Intelligence] the success of our effective dose message . . . ."   That same day, Babich emailed all regional sales managers and blind-copied Kapoor: ***"Our number 1 goal right now is effective dose and having reps promote 60 units of the low strength is not going to cut it."***

68.   The effective-dose scheme, like the Speaker Program, was not merely the random acts of a few rogue sales representatives.   Rather, it was a core component of the Kapoor-Babich unlawful scheme.   The effective-dose strategy was so pervasive, in fact, that it featured prominently in a satirical rap music video,

entitled "Great by Choice," that was played at the Insys national sales meeting in 2015 (which Kapoor and Babich attended).

69.    In the video, Insys salesforce representatives dance and rap next to a person dressed in a Subsys canister costume.  The label on the Subsys costume displayed a prominent 1,600 microgram label—the highest dose of Subsys available. In the video, the salesforce employees brag about pushing doctors to increase the dosage of Subsys that they were prescribing for any given patient, a process known as "titration," rapping: "I love titrations.  Yeah, that's not a problem.  I got new patients, and I got a lot of 'em.  If you want to be great, listen to my voice.  You can be great, but it's your choice."



The video ends with a cameo by Burlakoff—a well-known and powerful personality among the company's salesforce—lifting the Subsys costume from his body and repeating the chorus pushing "titration."  In other words, the video not only boasted about the widespread practice of encouraging doctors to write improperly strong

prescriptions for Subsys, but also encouraged salesforce representatives to choose to become "great" by pushing "titration."

70.   To further ensure that Insys's salesforce was incentivized to pursue the effective-dose strategy as much as possible, Kapoor and Babich implemented a "pay for performance" compensation model.   The pay-for-performance model that Kapoor and Babich implemented differed from pharmaceutical industry norms in two respects.  First, because salesforce members were given a less-than market-rate base salary (about 20-30% below "big pharma" salaries), they were paid a significant percentage of their compensation through performance bonuses.   Second, unlike most pharmaceutical companies, those performance bonuses were "uncapped," meaning that the bonuses had no upper limit.   Burlakoff testified in the Criminal Action that the unusual compensation structure Kapoor implemented for corrupt salesforce members meant they were "highly incentivized to sell," as it led to quarterly six-figure bonuses for some salesforce members.

c.   **The Insurance Fraud Scheme Involving the IRC.**

71.   The third main component of the Kapoor-Babich scheme to unlawfully boost revenues from medically unnecessary and otherwise illicit Subsys prescriptions was the insurance reimbursement center ("IRC").   The IRC was Insys's in-house department devoted to securing coverage approvals from insurance companies.   But the IRC and its activities were far from standard in the industry.

30

Rather, through the IRC and its personnel, Kapoor and Babich implemented a pervasive scheme of lying to insurers to secure insurance coverage for Subsys patients to cover the significant costs of medically unnecessary (and often illegal) Subsys prescriptions.

72.    Many health insurance companies require patients to obtain prior authorization from the insurers before agreeing to cover the costs of prescriptions for TIRF medications, like Subsys.  Such prior authorizations can be obtained by the prescribing physicians either directly from the insurer or through an entity specializing in the practice of obtaining such approvals, such as a pharmacy benefit manager ("PBM").  In general, patients must obtain and present a specific medical diagnosis to obtain a prior authorization.  Moreover, many insurers will not agree to cover the costs of expensive drugs (like Subsys) until the patient has tried and failed less expensive, preferred medications.

73.    In effect, therefore, standard health insurance industry practices surrounding prior authorizations serve as an indirect check on improper Subsys prescriptions.  Because: (1) insurance carriers would only agree to cover the costs of Subsys with a prior authorization and (2) the prior authorization process required a medical diagnosis and effort to try alternative medications, insurance carriers frequently denied reimbursement requests for inappropriate Subsys prescriptions.

74.    The hurdles necessary to obtain prior authorizations and the lack of insurance company reimbursement absent such authorizations posed a significant obstacle to the overall Kapoor-Babich scheme.  As early as 2012, Kapoor and Babich became concerned that prior authorization requests for Subsys were being denied at high rates.  Consequently, Kapoor and Babich sought a potential end-run to the problem and began exploring the viability of creating an in-house reimbursement center that could assist Subsys-prescribing physicians in getting prior authorizations for Subsys patients.

75.    Kapoor and Babich tapped Michael Gurry ("Gurry"), the company's Vice President for Managed Markets, to spearhead that initiative.  On September 14, 2012, Gurry sent Kapoor and Babich an email attaching a "SUBSYS Prior Authorization Action Plan."  The attachment detailed a five-phase plan to, among other things, train sales employees on the prior authorization process and dynamics, create a "tool kit" for employees to use to obtain prior authorizations, and hire a prior authorization specialist.  The goal of the plan was "increas[ing] pull through of SUBSYS prescriptions."

76.    In furtherance of the plan, in October 2012, Gurry hired Elizabeth Gurrieri ("Gurrieri") as a prior authorization specialist to run a pilot program for what would later become the IRC.  The pilot program proved successful in gaining higher rates of prior authorization approvals.  Following the success of the pilot

program, Gurry led a full launch of the IRC in January 2013. Gurrieri was subsequently promoted to Manager of Reimbursement Services in March 2013.

77.    The IRC consisted of a team of Insys employees with the formal title of "prior authorization specialists" who placed calls to insurers. Their sole responsibility was to help obtain coverage approval for as many Subsys prescriptions as possible, regardless of medical necessity.

78.    For the IRC to function, Insys first needed permission from physicians to allow the IRC to submit prior authorization requests for them. That is, Insys needed doctors to expressly "opt in" to allowing Insys to submit prior authorization requests on their behalf. To do so, physicians were generally required to fill out "opt-in" forms, which formally granted a third party the authority to seek prior authorization on behalf of the physician and the patient. These forms were required by federal law to be filled out by the physicians themselves. But at the behest of Kapoor, Babich, and their corrupt subordinates like Burlakoff, Gurry and Gurrieri, Insys salesforce members and other employees routinely filled out the opt-in forms themselves and merely had the physicians sign the completed form. Gurrieri testified at the Criminal Action that she repeatedly heard Kapoor and Burlakoff demand that Insys employees "make sure the [necessary] boxes are checked" on the opt-in forms "and then have the doctor sign [the completed form]."

79.     Several efforts were made to conceal from insurance companies that the IRC representatives were Insys employees.  For instance, the IRC operated out of a separate building that lacked any signage to indicate it was owned or operated by Insys.  Also, IRC representatives were instructed to tell insurers that they were calling "from" a particular physician's office.  Further, IRC representatives were instructed to say "reimbursement center" instead of "Insys reimbursement center" when they answered the phone.  As Gurrieri testified in the Criminal Action, IRC representatives took these measures "because when insurers would call back the [IRC representatives] [saying] that they needed more information, if we were answering it as Insys Therapeutics, they wouldn't want to speak to us because we were a third party and not the physician's office."

80.     Kapoor and Gurry also encouraged IRC representatives to "maneuver" around questioning from insurance companies—*i.e.*, to lie—in order to ensure they received insurer approvals for Subsys.  For instance, when Subsys was prescribed for off-label uses, insurance companies would typically ask IRC representatives if the patient was suffering with "breakthrough cancer pain"—the FDA's on-label indication—and deny coverage if the answer was "no."  Gurry instructed Gurrieri to "maneuver through the questions about cancer" and "find ways to answer questions in a manner that would gain approval," stressing his philosophy that they should always "ride the gray line" between telling the truth and lying.

81.     In keeping with Gurry's instructions, Gurrieri even developed a "question-and-answer" list ("Q&A List") for the IRC representatives.  This list contained questions commonly asked by insurance companies and answers to those questions that were designed to lead to approval.  IRC representatives were instructed to provide answers to questions based on the guidelines set forth in the Q&A List, regardless of whether a particular answer was truthful for a given patient.

82.     For example, one of the misleading responses on the Q&A List was referred to by the IRC representatives as the "spiel"—a script that IRC representatives were instructed to use when insurers asked whether Subsys was being prescribed to treat breakthrough cancer pain.  In the original version of the "spiel," when asked whether Subsys was being prescribed for the management of breakthrough cancer pain, IRC representatives were instructed to say: "Yes, this patient does have breakthrough pain."  In a subsequent version of the "spiel," IRC representatives were instructed to answer the same question by saying: "The physician has stated that Subsys is approved for treating breakthrough cancer pain, so he is treating that breakthrough pain under [insert diagnosis code]."  While the "spiel" was revised from time to time, its purpose always was to suggest to insurers that a Subsys prescription was for the treatment of breakthrough cancer pain, even though frequently it was not.

83.     Gurry and Burlakoff, among others, regularly discussed the fact that IRC representatives were using the "spiel."  And Kapoor also personally helped in drafting versions of the spiel.

84.     As another example of the systemic fraud put in place at the IRC with the knowledge and blessing of Kapoor and Babich, Gurry and Gurrieri instructed IRC representatives to lie to insurers regarding the medications patients had previously "tried and failed."  Because Subsys was very costly and there were cheaper alternatives on the market, insurers would often ask what medications a patient had already tried and failed before approving a Subsys prescription.  Some insurance companies even had a specific list of medications that they required a patient to have tried and failed.  To get around this, Gurrieri developed a list of the tried-and-failed medications certain insurance companies required before approving Subsys.  Gurrieri discussed this list with Gurry.  At Gurry's direction, Gurrieri provided this list to the IRC representatives.  Gurrieri instructed them that, when asked by an insurer which medications a patient had tried and failed, they were to recite the names of the tried-and-failed medications on Gurrieri's list—regardless of what the patient's medical records stated.

85.     Finally, Gurry and Gurrieri also instructed IRC representatives to provide diagnosis codes to insurers that were likely to lead to approval, even if the patient's medical records did not suggest the diagnosis was accurate.  In particular,

Gurry and Gurrieri trained IRC representatives to use cancer-related diagnosis codes to provide the impression that a patient suffered from cancer, regardless of whether that was true or not.

86.   To ensure that IRC representatives were incentivized to go along with these fraudulent practices, Gurry, at Kapoor's direction, created a pay structure to reward IRC representatives who gained prior authorization approvals with incentive bonuses.  Every week, Gurry would establish a minimum number of approvals, referred to as a "gate," that the entire group of IRC representatives had to meet before any of them could be eligible for a bonus.  Once the "gate" number was satisfied, IRC representatives were paid a bonus based on how many approvals they obtained from insurers.  Like the compensation structure for salesforce members, this structure created improper incentives for IRC representatives to engage in fraudulent practices to obtain approvals.

87.   Although Kapoor and Babich let Gurry and Gurrieri spearhead the fraudulent practices that permeated every facet of the IRC's operations, Kapoor and Babich were nevertheless fully aware of and approved the IRC's illegal practices. Indeed, according to Gurrieri's testimony, Insys's management "constantly asked" for and received regular updates about whether the fraudulent methods being employed at the IRC were successful in obtaining prior authorizations.  Kapoor and

Babich also routinely discussed the IRC's operations with other members of Insys's management during the company's daily 8:30 a.m. management call.

88.     Moreover, Kapoor took additional steps to closely monitor the IRC's "success" in obtaining prior authorizations by pressing Gurrieri for precise details and data regarding IRC's operations.  For instance, in June 2014, Kapoor told Gurrieri to create a spreadsheet listing the "main" insurers with whom the IRC dealt, along with information such as "what was required to get an approval . . . [w]hether the approved compliance spiel would work with those payers, what tried and failed medications would work to gain approval, and . . . what diagnosis codes would help to get an approval."

89.     On top of closely monitoring the IRC's performance in obtain prior authorizations, Kapoor had a habit of making his passion about IRC's approval rates known.  Kapoor regularly screamed his demands and expectations to Gurry and Gurrieri during daily calls, and delivered express instructions to Gurry to relay to IRC representatives.  In particular, Kapoor demanded that the IRC representatives take measures to increase the approval rate for prior authorization requests, and on numerous occasions stressed that his goal was for the IRC to achieve a 100% approval rate.  According to Gurrieri, Kapoor "was extremely hostile" and put an extraordinary amount of pressure on the IRC personnel to achieve that objective.  In

fact, Kapoor expressed the belief that they had to "game" the insurance companies to get them to pay for Subsys prescriptions, regardless of the propriety of doing so.

90.     Eventually, Kapoor became so obsessed with monitoring the IRC's success in obtaining prior authorizations that Kapoor had the IRC hire someone whom Kapoor then instructed to report IRC performance metrics directly back to himself.  According to Gurrieri's testimony in the Criminal Action, this individual essentially acted as a "spy" for Kapoor within the IRC.

### 4.     The Kapoor-Babich Scheme Culminates in Criminal Convictions.

91.     The criminal scheme implemented by Kapoor and Babich ultimately unraveled as the government secured guilty pleas from many salesforce members and Speaker Program doctors who had effectuated the scheme.  The government methodically moved from these lower-ranking participants up the chain, all the way to Kapoor and Babich, the chief architects of the vast criminal scheme.  By 2019, dozens of individuals associated with Insys—including Kapoor, Babich, and Burlakoff—had been convicted of federal crimes, including racketeering.  And as of the drafting of this complaint, the government continues to pursue doctors who prescribed Subsys in exchange for bribes from corrupt members of Insys's salesforce.

#### a.     Kapoor, Babich, and Other Senior Management Are Convicted of Criminal Racketeering.

92.     On December 6, 2016, Babich, Burlakoff, Gurry, Lee, Rowan, and

Richard Simon ("Simon") were indicted in the Criminal Action. The original Indictment contained four counts: (1) racketeering conspiracy (against all six defendants), (2) mail fraud conspiracy (against Babich, Burlakoff, Simon, Lee, and Rowan), (3) wire fraud conspiracy (against Babich and Gurry), and (4) conspiracy to violate the anti-kickback law (against Babich, Burlakoff, Simon, Lee, and Rowan).

93.   On October 24, 2017, Kapoor was added as a defendant in the First Superseding Indictment in the Criminal Action, joining the original defendants. Kapoor was charged with all four counts in the First Superseding Indictment, unchanged from the original Indictment.

94.   On September 11, 2018, the government filed a Second Superseding Indictment returned by the grand jury. In the Second Superseding Indictment, the government charged all seven defendants, including Kapoor and Babich, with racketeering conspiracy. The government included the following predicate acts or racketeering activity: mail fraud, distribution of controlled substances in violation of the Controlled Substances Act ("CSA"), honest services mail fraud, wire fraud, and honest services wire fraud.

95.   On November 28, 2018, Burlakoff became the first high-ranking Insys executive to plead guilty when he entered a guilty plea to one count of racketeering conspiracy. Burlakoff also agreed to cooperate with the government.

96.    On January 9, 2019, and shortly in advance of the trial in the Criminal Action, Babich pleaded guilty to one count of conspiracy to commit mail fraud and wire fraud and one count of mail fraud and agreed to cooperate with the government.

97.    Babich pleaded guilty to a conspiracy that existed "between at least May 2012 and December 2015." As part of his plea agreement, Babich and the government submitted an agreed statement of facts.  The statement provided that Babich, "in concert with, and at the direction of his superior John Kapoor," used the Speaker Program "to bribe medical professionals to prescribe Subsys to as many patients as possible," without regard to the risks posed to patients.  Further, the statement provided that Kapoor and Babich "directed IRC employees" to "provide false and misleading information to insurance companies and PBMs to obtain authorization and payments for Subsys."

98.    On January 17, 2019, a 53-day trial commenced against the five remaining defendants: Kapoor, Gurry, Simon, Lee, and Rowan.  During the trial, Babich and Burlakoff testified alongside many other former Insys employees, including Napoletano, Gurrieri, and Davis.  Kapoor did not take the witness stand.

99.    On May 2, 2019, the jury found all five defendants guilty of a racketeering conspiracy.  With respect to the predicate racketeering acts, the jury found that the defendants committed honest services mail fraud, honest services wire fraud, mail fraud, wire fraud, and that they violated the CSA.

41

100.   Following post-trial motions, the District Court held that the government had not presented sufficient evidence that the defendants intended for doctors to prescribe Subsys for non-legitimate uses.  As a result, the Court vacated the jury's findings on the predicate acts of honest services fraud and the violation of the CSA.  The Court otherwise declined to vacate the jury's findings on the mail fraud and wire fraud predicates to the racketeering conspiracy convictions and denied the defendants' motions for a new trial.

101.   On January 22, 2020, Babich was sentenced to 30 months in prison and 3 years of supervised release.  Babich has finished serving his prison sentence.

102.   On January 23, 2020, Kapoor was sentenced to 66 months in prison, 3 years of supervised release, a fine of $250,000, restitution of $59.7 million, and forfeiture of $1.9 million.  Kapoor is currently serving his prison sentence.

103.   On January 21–23, 2020, Burlakoff, Gurry, Simon, Lee, and Rowan were sentenced to prison terms ranging from one to three years, and three years of supervised release.  Gurry, Simon, and Rowan were also ordered to pay forfeiture and restitution.

104.   Following their sentencing, Kapoor, Gurry, Simon, Lee, and Rowan appealed their convictions to the First Circuit.  The government cross-appealed, arguing that the District Court erred in vacating the jury's findings on the CSA and honest services fraud predicates.

105.    On August 26, 2021, the First Circuit affirmed all of the jury's special findings and verdicts against all defendants, thereby reversing the District Court's post-trial ruling on the predicate acts issue.

106.    In its blistering 141-page opinion, the First Circuit excoriated Kapoor and his co-defendants for their "unalloyed greed" that squandered Subsys's potential and ruined lives.

### b.    Other Insys Salesforce Members and Speaker-Program Physicians Are Convicted of Federal Crimes.

107.    In addition to the seven Insys executives convicted in the Criminal Action, a litany of other Insys employees and Subsys-prescribing doctors have been convicted of crimes for their roles in the Kapoor-Babich bribery and insurance fraud schemes.   Many of these individuals recognized their own criminality by pleading guilty and then cooperating with government investigators.

108.    Among the Insys employees to plead guilty was Gurrieri, who pleaded guilty to wire fraud conspiracy in June 2017 in connection with her role at the IRC.

109.    Managers running Insys's salesforce also could not escape scrutiny.   In addition to Burlakoff, Lee, Simon, and Rowan, who all held high-ranking sales positions at the company and were convicted in the Criminal Action, several other salesforce managers were pursued by the DOJ.   For instance, Karen Hill, a former Regional Sales Manager, pleaded guilty in July 2017 to conspiring to violate the Anti-Kickback Statute.   Jonathan Roper, a former District Sales Manager, pleaded

guilty in August 2017 to conspiring to violate the Anti-Kickback Statute.  Jeffery Pearlman, a former district sales manager, pleaded guilty in August 2018 to conspiring to pay illegal kickbacks to doctors.

110.   The government also pursued charges against lower-ranking salesforce members.  Natalie Perhacs was the first Insys employee to plead guilty in February 2016 for her work with "pill mill" Drs. Ruan and Couch.  Insys had hired Perhacs as an inducement to Dr. Ruan, who was romantically interested in her. Other salesforce members, like Natalie Levine and Fernando Serrano (who worked closely with Roper), also pleaded guilty to conspiring to pay illegal kickbacks to doctors.

111.   The physicians and healthcare practitioners who received kickbacks have also been top targets of prosecutors.  Dr. Awerbuch (arrested in 2014) and nurse practitioner Heather Alfonso (convicted in 2015), whose prosecutions are described in more detail below, marked the beginning of that campaign.  To date, at least 25 doctors and healthcare practitioners have been charged or convicted under federal or state law for receiving bribes in exchange for prescribing Subsys.

112.  In May 2015, Dr. Ruan and Dr. Couch, two of the highest-volume Subsys prescribers and speaker fee recipients, were indicted for conspiring to illegally distribute controlled substances and conspiracy to commit healthcare fraud. After a joint investigation by the FBI and DEA, they were charged with additional offenses, including racketeering conspiracy, mail and wire fraud, and conspiracy to

violate the Anti-Kickback Statute.  In 2017, Dr. Ruan and Dr. Couch were convicted by a jury and sentenced to 21 and 20 years in prison, respectively.

113.   The United States Court of Appeals for the Eleventh Circuit affirmed the convictions and sentences on all but one count.[3]  In describing the Speaker Program, the Court held that "[t]he evidence clearly showed that ***Insys was using its program as a cover to funnel money to its top prescribers***—Couch and Ruan."[4]

114.   Gordon Freedman, who ran a private pain management office on Manhattan's Upper East Side, received over $300,000 in Speaker Program fees from Insys.  He pleaded guilty in 2019 and was sentenced in July 2021 to more than 17 years in prison.

115.   Jerrold Rosenberg, a Rhode Island doctor and a professor at Brown University, pleaded guilty in October 2017 to taking nearly $188,000 in kickbacks from Insys and was sentenced to 4 years in prison and ordered to pay $754,000 in restitution.

116.   Christopher Clough, a New Hampshire physician's assistant who was one of the top-five prescribers of Subsys in the country, was convicted by a jury in December 2018 for accepting bribes from Insys and sentenced to four years in

--------------

[3] *United States v. Ruan*, 966 F.3d 1101 (11th Cir. 2020), *cert. granted*, No. 20-1410 (U.S. Nov. 5, 2021).

[4] *Id.* at 1146.

prison.  The First Circuit affirmed Clough's conviction in October 2020.[5]  The Court credited the jury's reasonable inference that "Clough's aberrant behavior was not reminiscent of a physician assistant prescribing based on need, but rather of a ***drug pusher—one who voluntarily furthered the conspiracy by knowingly and willfully enriching Insys*** at the expense of the U.S. Government in exchange for kickbacks through sham speaking engagements."[6]

117.   In July 2021, the government secured two more guilty pleas from medical practitioners for taking bribes from Insys.  And in September 2021, the government filed a new civil action under the Anti-Kickback Statute against a prescriber connected with Insys in Florida.

### c.   Insys Resolves the DOJ's Criminal and Civil Claims, and Collapses into Bankruptcy.

118.   Due to the pervasive unlawfulness of the Kapoor-Babich scheme, Insys too became a target of federal prosecutors.  On June 5, 2019, Insys entered a global resolution to settle the federal government's civil and criminal investigations for $225 million.  This global resolution involved three main components.

119.   <u>First</u>, Insys resolved the government's civil False Claims Act claims by entering into a settlement agreement, pursuant to which Insys agreed to a $195

---

[5] *United States v. Clough*, 978 F.3d 810 (1st Cir. 2020).

[6] *Id.* at 821.

million payment, with $5 million to be paid within one day of the execution of the agreement.

120.   Second, Insys Pharma, a subsidiary of Insys, entered into a plea agreement (the "Plea Agreement") in which it pleaded guilty to five counts of mail fraud and agreed to pay a $2 million fine and $28 million in forfeiture.  In parallel, Insys entered into a deferred prosecution agreement (the "DPA") in which it agreed, *inter alia*, that it was jointly and severally liable for the money owed by Insys Pharma pursuant to the Plea Agreement.

121.   Third, Insys and certain subsidiaries also entered into a corporate integrity agreement with Office of the Inspector General of the U.S. Department of Health and Human Services, in which the company agreed, *inter alia*, to establish and maintain an extensive compliance program and to cease the marketing and promotion of Subsys within 90 days, or to divest Subsys entirely.

122.   Five days after the June 5, 2019 resolution, Insys collapsed under the weight of billions of dollars in liabilities and sought bankruptcy protection.  As described in section C, *infra*, the pervasive Kapoor-Babich scheme left Insys exposed to hundreds of criminal and civil proceedings.

## B.   THE OUTSIDE DIRECTORS ENABLE THE CRIMINAL SCHEME WITH THEIR BAD-FAITH CONDUCT.

123.   None of the pervasive criminality implemented by Kapoor and Babich, as described above, would have been possible had it not been for the shocking bad

faith of the Outside Directors in failing to carry out the fiduciary duties they owed to Insys. Rather than protect Insys and manage it in the best interest of its stakeholders, the Outside Directors—motivated by personal relationships with Kapoor—served as enablers. Despite Insys's heavily regulated and inherently risky business, the Outside Directors failed to implement compliance and monitoring initiatives to safeguard Insys from running afoul of the law. And despite learning of numerous "red flags" of potential unlawful activity, the Outside Directors wholly failed to investigate or to ensure that the few, token compliance steps they did implement were even the slightest bit effective.

       **1.**      **<u>Kapoor Handpicks the Outside Directors to Give Him Free Rein with the Company.</u>**

124. As Insys's founder and controlling stockholder, and the mastermind behind the company's criminal sales practices, Kapoor wanted free rein to market and sell Subsys as he desired, legally or not. To that end, he wielded his powers as controlling stockholder to handpick directors who would serve as rubber-stamping enablers. In appointing directors to the Insys board, Kapoor chose loyal friends and associates, with only one exception (Dr. Stanley).

125. Kapoor's selection of directors served his nefarious ends well, as the Outside Directors deferred to Kapoor and acted as precisely the sort of rubber-stamping enablers that he envisioned. As Babich testified in the Criminal Action:

With the [b]oard, all of these people [ Kapoor] had past history with. Everyone knew he owned greater than 60 percent of the shares.  So the board meetings were just to approve or disapprove of whatever thing he wanted to do with the company.

126.   Babich further explained: ***"The board was a rubber stamp.  Whatever John [Kapoor] proposed, the board would approve."***  Indeed, during his testimony, Babich could not recall a single instance in which the board rejected a matter or motion brought by Kapoor.

127.   This deference to Kapoor stemmed, in large part, from the pre-existing relationships between all four of the Outside Directors and Kapoor.

128.   <u>First</u>, Kapoor installed Fourteau as an Insys director in March 2011, in part because they have been personal friends and business associates since at least 2003.  In 2003, Kapoor recruited Fourteau to join Sciele, another pharmaceutical company founded by Kapoor.  Fourteau eventually became President and CEO of Sciele.  Fourteau also served alongside Kapoor as one of Sciele's directors from 2003 to 2008.

129.   In 2006, Kapoor asked Fourteau to join a predecessor to Insys as a board member.  Kapoor was interested in using a sublingual spray delivery, similar to a product that Sciele produced, for fentanyl administration.  Fourteau served as a director on Insys's predecessor from 2006 until 2008, and then joined the Insys board in March 2011 at Kapoor's request.

130.   In 2008, Fourteau founded a pharmaceutical company called New Haven Pharmaceuticals ("New Haven").  When he joined the Insys board in 2011, Fourteau was concurrently serving as President and CEO of New Haven.  Through EJ Funds (an affiliate of EJ Financial controlled by Kapoor), Kapoor made a significant investment in New Haven in 2012.  New Haven's marketing materials referred to Kapoor as one of its "key shareholders."

131.   According to Babich's testimony in the Criminal Action, Kapoor often used Fourteau as a "buffer" or intermediary if he felt that Insys management was not following Kapoor's directions.

132.   Second, Kapoor installed Lapalme as an Insys director in March 2011, in part, because they were good friends and had known each other for roughly 35 years.  Lapalme has over 40 years of operational and leadership experience in the pharmaceutical industry, including as President and CEO of North America Ethypharm Inc., CEO and Chairman of Rhone-Poulenc Pharmaceuticals, Inc. (Canada), Senior Vice President and General Manager of North America Ethicals, a division of Rhone-Poulenc Rorer, Inc. (now known as Sanofi), and chairman of the boards of several other pharmaceutical companies.  Lapalme also served on the board of directors of Sciele alongside Kapoor from 2000 to 2008.

133.   Third, Kapoor installed Meyer as an Insys director in 2011, in part, because of Meyer's numerous experiences managing companies in which Kapoor

had invested.  In 2005, Kapoor asked Meyer to join the board of a private company called Alliant Pharmaceuticals ("Alliant"), in which Kapoor had made a significant investment.  Alliant was later sold to Sciele in 2007 for over $122 million.

134.  Kapoor also installed Meyer on the board of directors of Akorn, Inc. ("Akorn") from 2009 to October 2020.  During part of that time, Meyer served as Chairman.  (Akorn initiated bankruptcy proceedings in 2020.)  Kapoor was one of Akorn's principal shareholders and, through his trusts and affiliates, was entitled to nominate up to three of Akorn's directors.

135.  Kapoor has also demonstrated trust in Meyer to manage his investments with companies outside of the pharmaceutical industry.  For example, Meyer is currently the Chief Investment Officer of JMV Realty Corporation, a property investment company in which Kapoor has invested millions of dollars.

136.  Fourth, Kapoor installed Tambi as an Insys director in November 2010, in part, because they were longtime friends and business associates. Tambi was previously associated with Lyphomed, a company that Kapoor purchased in 1981 and thereafter controlled.  Like Meyer, Kapoor also tapped Tambi to serve as a director of Akorn, with Tambi serving as EJ Financial's nominee to the Akorn board.

137.  These four friends and associates that Kapoor handpicked as Outside Directors, along with Kapoor and Babich, held six of the seven director seats on Insys's board of directors.  The seventh director was Dr. Stanley (who joined the

board in March 2013, after the Subsys launch).  Dr. Stanley was the only director who lacked any outside personal or professional relationship with Kapoor.  Not coincidentally, Stanley was also the only Insys director who ever challenged Kapoor during his time on the board.  When Stanley stood up to Kapoor, the other directors would tell Stanley in various ways to drop the topic to avoid drawing Kapoor's ire.

138.   Save for Stanley, all of Insys's directors were devoted to Kapoor because he was their mentor (in Babich's case), friend, and/or the investor who continually gave them major career opportunities.  The Outside Directors' individual allegiances to Kapoor lessened their willingness to tell him "no" or even to install guardrails to prevent his wrongdoing.   To many, including Insys itself, their acquiescence, cowardice, and bad faith proved lethal.

**2.**     **From the Launch of Subsys in March 2012, the Outside Directors Fail to Implement Any Compliance or Monitoring Programs.**

139.   By the very nature of its business, Insys faced a number of significant legal and regulatory landmines that could destroy the company if careful steps were not taken to ensure that the company complied with applicable laws and regulations.  First, Insys's main product was Subsys, an inherently dangerous and heavily regulated Schedule II controlled substance with fentanyl as its active pharmaceutical ingredient (section A.1, *supra*).  Second, the sale and marketing of Subsys subjected the company to the risk of possible violations of the False Claim Act, Anti-Kickback Statute, and statutes and regulations concerning the off-label use of products (section

A.2, *supra*).  Accordingly, compliance with the myriad of statutes and regulations applicable to the sale and marketing of narcotics was "mission critical" for the company to succeed.

140.  The legal compliance risks inherent to the company's business were well-known to the Outside Directors.  Indeed, Insys's securities filings, which the Outsider Directors reviewed and/or signed, expressly acknowledged such risks.

141.  For example, the Outside Directors reviewed and approved the S-1 registration statement that Insys first filed on March 30, 2011 (and the subsequent amendments thereto) in connection with its initial public offering (the "Registration Statement").  The Registration Statement acknowledged that Insys was "subject to numerous complex regulations and failure to comply with these regulations, or the cost of compliance with these regulations, may harm our business."  The Registration Statement further acknowledged that, "[i]n particular, sales, marketing and business arrangements in the healthcare industry are subject to extensive laws and regulations intended to prevent fraud, misconduct, kickbacks, self-dealing and other abusive practices," such as restrictions or prohibitions on "a wide range of pricing, discounting, marketing and promotion, sales commission, customer incentive programs and other business arrangements."

142.  Further, the Registration Statement acknowledged that Insys, "[a]s a pharmaceutical company," is subject to "certain federal and state healthcare laws

and regulations pertaining to fraud and abuse and patients' rights." Among those laws was the federal Anti-Kickback Statute, which constrained Insys's:

> marketing practices, educational programs, pricing policies, and relationships with healthcare providers or other entities, by prohibiting, among other things, soliciting, receiving, offering or paying remuneration, directly or indirectly, to induce, or in return for, either the referral of an individual or the purchase or recommendation of an item or service reimbursable under a federal healthcare program, such as the Medicare and Medicaid programs.

143.  Lastly, the Registration Statement acknowledged that "compliance programs can mitigate the risk of investigation and prosecution for violations of these laws," but that "achieving and sustaining compliance with applicable federal and state privacy, security and fraud laws may prove costly."

144.  Insys's annual Forms 10-K included similar disclosures of the myriad compliance risks that Insys faced.  The Outside Directors acknowledged these disclosures by signing them annually (along with Kapoor and Babich).  For example, Insys's Form 10-K for the year ending December 31, 2013 warned that "sales, marketing and business arrangements in the healthcare industry are subject to extensive laws and regulations intended to prevent fraud, misconduct, kickbacks, self-dealing and other abusive practices."  That same Form 10-K further explained that "several [] types of state and federal laws have been applied to restrict certain marketing practices in the pharmaceutical industry in recent years," including "anti-kickback and false claims statutes."  Specifically, the Form 10-K noted that:

The Anti-Kickback Statute has been interpreted to apply to arrangements between pharmaceutical manufacturers on the one hand and prescribers, purchasers and formulary managers on the other. Although there are a number of statutory exemptions and regulatory safe harbors protecting certain common activities from prosecution, the exemptions and safe harbors are drawn narrowly, and our practices may not in all cases meet all of the criteria for statutory exemptions or safe harbor protection. Practices that involve remuneration that may be alleged to be intended to induce prescribing, purchases, or recommendations may be subject to scrutiny if they do not qualify for an exemption or safe harbor.

145. The Form 10-K further acknowledged that "[t]he term 'remuneration' has been broadly interpreted to include anything of value, including for example, gifts, discounts, the furnishing of supplies or equipment, credit arrangements, payments of cash, waivers of payment, ownership interests and providing anything at less than its fair market value." As well, the Form 10-K noted that:

Although compliance programs can mitigate the risk of investigation and prosecution for violations of these laws, the risks cannot be entirely eliminated. Any action against us for violation of these laws, even if we successfully defend against it, could cause us to incur significant legal expenses and divert our management's attention from the operation of our business. Moreover, achieving and sustaining compliance with applicable federal and state privacy, security and fraud laws may prove costly.

146. Thus, the Outside Directors were fully aware of the legal and compliance risks that Insys faced. Yet despite the obvious risks inherent in Insys's business and the Outside Directors' extensive experience in the pharmaceutical industry (section B.1., *supra*), the Outside Directors failed to implement any compliance, audit, or monitoring functions to ensure that Insys operated lawfully

and in compliance with the statutory and regulatory regimes applicable to its business.

147.    Indeed, Insys lacked *any* internal audit function and did not hire *any* full-time compliance personnel, or even a general counsel, until 2014, long *after* the launch of Subsys (in early 2012) and Insys's initial public offering (in early 2013). The Outside Directors (and Insys's board as a whole) failed to implement board-level monitoring of the company's mission critical compliance risks in at least six ways at the time of the Subsys launch in March 2012.

148.    First, from the time of the Subsys launch in March 2012 through at least December 2013, the Insys board had no committee tasked with direct responsibility to monitor compliance.    Although Insys later formed a special/compliance committee in December 2013, that committee did not actually meet until August 2015 (as further described below).    And the charters for the Insys board committees existing prior to that time indicate that none of those committee was charged with direct oversight and monitoring responsibility for the company's mission critical compliance issues.

149.    Second, the Insys board had no regular process or protocols requiring management to apprise the board of compliance issues, instead relying only on *ad hoc* reporting from Kapoor, Babich, and their underlings.

150.    Third, the Insys board did not have a set schedule to address compliance

issues on a regular basis, such as quarterly or bi-annually, especially prior to mid-2015.

151.  <u>Fourth</u>, Insys management and executives were aware of red flags that were never reported to the board (as discussed below), further establishing that there was no board-level reporting system in place.

152.  <u>Fifth</u>, the Outside Directors did not obtain complete and accurate information regarding the company's myriad compliance issues from management.

153.  <u>Sixth</u>, Insys's board meeting minutes reflect that there were no meaningful or regular board-level discussions of compliance issues from the Subsys launch in March 2012 until at least December 2013.

154.  The Outside Directors' failures to implement board-level monitoring and oversight of the company's mission critical compliance risks, install proper oversight personnel and fully implement compliance procedures were especially galling given that Kapoor and Babich informed the Outside Directors of sales and marketing plans that were inherently risky from a compliance standpoint.  Indeed, during 2012, the Outside Directors were made aware of at least four aspects of the sales and marketing strategy that significantly increased Insys's risk profile.

155.  <u>First</u>, Babich informed the Outside Directors of management's hiring strategy to find inexperienced salesforce members, and specifically informed the board in an April 11, 2012, email that: "[a] number o[f] our reps have no prior

pharma experience." Hiring inexperienced salesforce personnel increased the risk of unlawful activity through mistakes made by those without prior understanding of what was appropriate behavior within the pharmaceutical sales industry and by the inability of inexperienced personnel to recognize questionable directions.

156.  <u>Second</u>, during a May 22, 2012, board meeting, the Outside Directors were informed that Kapoor and Babich intended to target marketing of Susbys on the top ten percent of rapid-onset-opioid prescribers (even though such pain doctors generally did not treat cancer patients for breakthrough cancer pain). Moreover, the board presentation plainly stated that "expand[ing] efforts to oncologists & allied health" would be addressed ***"secondarily."*** Thus, the board was informed that Insys's marketing efforts would be primarily aimed at pain doctors, generally—not oncology practices, as would have been appropriate given the FDA's narrow indications for Subsys as a breakthrough pain treatment for cancer patients. Similarly, in October 2012, the board was informed by Babich of new initiatives to "target" the doctors who prescribed high-strength—*i.e.*, 1200 and 1600 mcg—doses of Subsys.

157.  <u>Third</u>, Babich informed the Outside Directors of Burlakoff's promotion to Vice President of Sales, and of Burlakoff's track record at Cephalon. Cephalon's $425 million settlement in 2008 for its illegal sales and marketing practices was a matter of public record. Babich further informed the Outside Directors that

Burlakoff had "a passion and fire that [wa]s needed to succeed."  Promoting a driven individual with a nefarious track record to Vice President of Sales created a significant risk that Cephalon's illicit practices would be implemented at Insys.

158.  <u>Fourth</u>, in 2012, the Outside Directors were informed of Kapoor's and Babich's plan to incorporate an unusual compensation structure to the salesforce that differed from pharmaceutical industry norms and created perverse incentives.

159.  In combination, Kapoor's and Babich's plan to hire inexperienced salesforce representatives, to target marketing efforts at high-prescribing pain doctors rather than oncologists, to promote someone with a dubious track record as Vice President of Sales, and to create a perverse incentive for salesforce personnel substantially increased the likelihood that Insys would run afoul of applicable law. In turn, the Outside Directors knew soon after the Subsys launch that Kapoor and Babich intended to pursue a particularly aggressive and risky sales and marketing strategy for an especially risky product.

160.  Moreover, Kapoor's and Babich's plan to incorporate a Speaker Program heightened compliance risks further still.  The potential for abuse of such programs is well-known within the pharmaceutical industry.  Indeed, the Pharmaceutical Research and Manufacturers of America ("<u>PhRMA</u>") publishes a "Code on Interactions With Health Care Professionals" that sets forth guidelines for pharmaceutical companies to follow.  The PhRMA code provides:

59

- "Company decisions regarding the selection or retention of health care professionals as speakers should be made based on defined criteria such as general medical expertise and reputation, knowledge and experience regarding a particular therapeutic area, and communications skills. Companies should continue to ensure that speaking arrangements are neither inducements nor rewards for prescribing a particular medicine or course of treatment."

- "Any compensation or reimbursement made to a health care professional in conjunction with a speaking arrangement should be reasonable and based on fair market value. Each company should, individually and independently, cap the total amount of annual compensation it will pay to an individual health care professional in connection with all speaking arrangements."

- "Each company also should develop policies addressing the appropriate use of speakers, including utilization of speakers after training and the appropriate number of engagements for any particular speaker over time."

- "Beyond providing all speakers with appropriate training, companies should periodically monitor speaker programs for compliance with FDA regulatory requirements for communications on behalf of the company about its medicines."

- "All companies that interact with health care professionals about pharmaceuticals should adopt procedures to assure adherence to this Code."

Insys did none of those things, and Insys's directors did nothing to ensure that the company would adhere to industry norms.

161.   In sum, despite the many known substantial compliance risks that were mission critical to the company, Insys's directors failed to implement any board-level compliance monitoring; any regular process or protocols through which

management apprised the board of compliance issues; or any internal reporting system through which employees could bring compliance concerns to the board's attention.  At best, management communicated with the board on an *ad hoc* basis. The Outsider Directors' utter failures to act in good faith to protect Insys continued even as they became aware of more and more "red flags" of potential misconduct from 2013 onwards.

  **3.**  **From 2013 Onward, the Outside Directors Fail to Implement Any Meaningful Monitoring and Compliance Programs Despite More and More "Red Flags" of Possible Unlawful Behavior.**

    **a.**  **February 2013: The Board Learns of the IRC and Belatedly Adopts "Skeletal" Company Policies.**

162. The Outside Directors learned of the IRC no later than a February 5, 2013 board meeting.  They were told not only of the program's existence, but that the goal of the IRC was to "optimize pull through" by "aggressively mitigat[ing] p.a. [prior authorization] barriers" (supposedly "in a compliant fashion," a modifier indicating that the IRC would necessarily entail compliance risks).  That stated objective screamed compliance risk.

163. Specifically, the steps to obtain prior authorizations should not have been perceived as "barriers," but rather as entirely appropriate protocols to follow for a potent and inherently dangerous narcotic like Subsys.  In essence, the scope of Subsys's FDA approval was as a drug of last resort for cancer patients' pain management, to be prescribed only after less powerful painkillers had failed.  Thus,

it was entirely consistent with Subsys's characteristics and the limited scope of its approved use for health insurance companies, before approving reimbursement requests, to insist on both typical prerequisites for a prior authorization: (a) a specific medical diagnosis; and (b) an attempted use of alternative drugs.  That Babich and Kapoor nevertheless viewed the need to follow such protocols as "barriers" that needed to be "aggressively mitigate[ed]," even going so far as to set up the IRC for that purpose, should have sounded alarm bells that the IRC might facilitate improper prescribing activity and correspondingly inappropriate (or fraudulent) requests for reimbursement from insurers.

164.   Nevertheless, the Outside Directors took no meaningful action to mitigate the obvious risks posed by the IRC's establishment, or to ensure that the IRC would operate appropriately.

165.   Instead, later that same month (and only after the IRC was established and the Speaker Program had commenced), Insys's directors made a token gesture by adopting several generic company policies—a Compliance Charter, Code of Conduct, and Compliance Program and Certification of Compliance.   Those documents were so inadequate that they were described as "skeletal" even by the part-time compliance consultant that Insys had previously retained, Leslie Zacks ("Zacks").  Zacks worked full-time at Arbor Pharmaceuticals in Atlanta, Georgia

and thus had minimal time for "consulting" work for Insys.  And he reported to Babich rather than to the Insys board.

166.   Moreover, the circumstances surrounding the adoption of these token, "skeletal" documents reflect the cavalier disregard that the Outside Directors acted with towards compliance issues.  First, the documents themselves were woefully inadequate to accomplish anything, as they did not provide for any internal audit function, board-level monitoring, line of communication between management and the board regarding compliance issues, or internal reporting mechanism for employees.  Second, the documents were not adopted until almost one year after the Subsys launch, despite being circulated at least eight months earlier and after repeated nagging by Zacks for the Insys board to adopt them.  Finally, the documents were not drafted until the IRC and Speaker Program were up and running, *i.e.,* the horse was out of the barn.

       **b.**    **July 2013: The Board Learns of Marketing Focused on "Effective Dose" and Receives Grave Warnings from the Part-Time Compliance Consultant.**

167.   The Outside Directors learned about two glaring "red flags" of significant compliance risks at the board meeting held on July 11, 2013.

168.   First, the Outside Directors were informed of the Kapoor-Babich plan to tie salesforce representative compensation to the strength of the prescribed dose of Subsys, one of the pillars of the effective-dose scheme.  Materials presented at the

July 2013 board meeting stated: "Emphasis on effective dose: tiered % payout based on strength." The perverse incentivization of the salesforce created significant compliance risks. Yet when Stanley questioned the strategy and explained that salesforce representatives should advocate for the "right dose, not the highest dose," he was told to shut up. And none of the Outside Directors questioned the strategy, or took any steps to make sure the misaligned incentive structure for the salesforce did not result in unlawful activity that would cause trouble for Insys.

169. <u>Second</u>, Zacks informed the Outside Directors of the woeful shortcomings in Insys's monitoring and compliance functions, while making specific recommendations of necessary steps for improvement. Specifically, Zacks:

- Implored the board to hire a full-time general counsel and compliance officer given the risks involved with Subsys and the promotional and reimbursement practices the company had adopted;

- Stressed that the company's risk profile required greater compliance measures and monitoring;

- Indicated that the company needed to "breath life into" its compliance apparatus, which remained "skeletal";

- Highlighted that the company's risk profile required greater compliance measures and monitoring;

- Expressly warned the board of compliance issues associated with Kapoor's salesforce promoting Subsys to providers for off-label use when the product's indication was exclusively for oncology;

- Recommended that Insys establish an audit program for the top twenty prescribers to ensure Insys was compliant; and

- Indicated that Insys should audit the IRC with "live listens."

This shocking presentation, the first formal compliance-related presentation that Insys's board had requested or received nearly eighteen months since the Subsys launch, still did not spur the Outside Directors into meaningful action.

170. The Outside Directors largely ignored Zack's concerns and broader advice. Instead, the board took the limited and hollow gesture of retaining Compliance Implementation Services ("CIS") to conduct a limited audit of the Speaker Program and of off-label marketing practices. Even then, the Outside Directors did not monitor, design, oversee, or even seek or receive any update on the progress of the limited audit until months later in December 2013. In the interim between Zacks's presentation and December 2013, the Outside Directors failed to participate in the limited audit, raise any questions with CIS about its lack of progress on its limited audit, or follow up with CIS in any way.

    c.    **December 2013: The Board Receives a Government Subpoena and Further Warnings from the Part-Time Compliance Consultant.**

171. In December 2013, the Outside Directors were confronted with two additional developments calling out for the implementation of effective monitoring and compliance functions at the company.

172. First, on December 10, 2013, Insys received a subpoena from the United States Department of Health and Human Services Office of Inspector

General (the "OIG Subpoena"), in connection with the federal government's investigation of the sales and marketing of Subsys. The OIG Subpoena sought 33 specific categories of documents, signaling that a whistleblower might be working with the government and that Insys likely had serious compliance issues.

173. On December 12, 2013, the Insys board met for a special telephonic meeting to discuss the OIG Subpoena, during which the board approved the engagement of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") as counsel to the company. Kapoor specifically recommended that Insys engage Skadden due to his pre-existing connections to the firm. The Outside Directors did not question the selection of Skadden or conduct any process to consider other counsel.

174. During that meeting, the board also resolved to create a special committee comprised of Fourteau, Lapalme, and Meyer (the "Special Committee") to lead the company's response to the OIG Subpoena. In connection with the formation of the Special Committee, the full board resolved: (a) "[a]s directed by the Board, the Special Committee shall liaise with Company's employees and receive periodic updates from management in connection with the Subpoena and the Company's compliance program"; (b) "[a]s directed by the Board, the Special Committee may also review and oversee the Company's compliance program and be responsible for the oversight of matters related to compliance with federal health care program requirements, FDA requirements and with applicable US laws and

regulations"; and (c) "that the Company's compliance committee shall meet at least monthly."

175.   As described in more detail below, however, the Special Committee was completely ineffectual.  Other than some introductory calls held in late 2013, the Special Committee did not meet monthly as its founding resolution required or separately from the full board *and was entirely inactive for over 18 months* (until August 2015).

176.   <u>Second</u>, during the same December 2013 board meeting in which the do-nothing Special Committee was appointed (and making its inaction far worse), the company's part-time compliance consultant, Zacks, sounded the alarm bells once again, especially related to the initial findings of CIS's limited audit of the Speaker Program.  Specifically, Zacks's notes reveal that he:

- Explained that CIS (which had been hired to conduct the limited audits approved by the board in July) had encountered "immediat[e] resistance" regarding the number of speaker programs to which they were given access;

- Advised the board that, CIS ongoing audit revealed serious issues with the Speaker Program, including multiple programs where speakers were paid speaker fees but were the only individuals in attendance (other than Insys employees);

- Told the board that a "high prescriber" had been flown across the country to speak to an empty restaurant (despite there being a trained speaker nearby);

- Informed the board that Insys had an "extensive budget for 3,200 speaker programs" in 2014, a volume typical of large

pharmaceutical companies rather than a small specialty company within only one significant product like Insys;

- Urged that it was "critical that the Company act proactively to identify any wrongdoing and to take action";

- Expressed his belief that misuse of the Speaker Program did not entail merely isolated incidents, but was likely a systemic problem;

- Advised the board that it should cease the Speaker Program until it had a better handle on the identified issues; and

- Reiterated the need for Insys to hire a full-time compliance officer, suggesting that the that person should report directly to the board, rather than within the marketing group, as the latter was akin to having the *"fox in the henhouse."*

More broadly, Zacks implored the board to expand upon CIS's limited review.

177.    Despite the many warning signs raised by Zacks and the initial findings of the CIS limited audit, the Outside Directors abdicated responsibility and deferred to Kapoor and Babich.  In particular, the Outside Directors rejected Zacks's advice to suspend the Speaker Program because Kapoor indicated that he did not want to change the company's current marketing strategy.   And instead of immediately hiring a Chief Compliance Officer to clean up the mess, the Outside Directors instead handed off the task to Babich, the corrupt CEO under whose watch the concerning practices were occurring.   In essence, the Outside Directors largely allowed the status quo to continue despite clear warning signs of possible unlawful activity surrounding the Speaker Program and otherwise.

**d.    February 2014: The Board Receives a Limited Audit of the Speaker Program Identifying More Warning Signs.**

178.    Two months after Zacks relayed concerns over CIS's initial findings, CIS completed its limited audit in February 2014, confirming that Zacks's concerns were justified.    CIS's completed audit, the results of which were shared with the Outside Directors, echoed those raised by Zacks at the July 2013 and December 2013 board meetings.    Moreover, CIS explained that it had selected a total of 22 programs for its limited-scope audit, but it was only able to monitor less than one-half of those programs (specifically, nine programs) due to cancellations.    Yet the Outside Directors did nothing to further investigate CIS's findings or explore whether the cancellations were indicative of larger compliance issues.

**e.    March 2014: The Board Allows Babich to Hire an Underqualified "Compliance Director"**

179.    Upon receiving the OIG Subpoena and receiving troubling reports from Zacks in December 2013, the Outside Directors allowed Babich to choose a "compliance director."    Unsurprisingly, after months of foot-dragging, Babich hired a "compliance director" in March 2014, Danielle Davis ("Davis"), who had no pharmaceutical experience and was relatively junior.    Rather than reporting to the board itself, she was directed to report to Franc Del Fosse ("Del Fosse"), who had just been hired as General Counsel in February 2014.    As Babich later testified in the Criminal Action: "[W]e didn't even go out and hire someone of the stature that

you should in that situation" as "overall focus on compliance, while I was there at the company, was not evident."

180.   Despite the company's extreme risk profile and many indications of possible compliance issues, the Outside Directors deferred to Babich on the selection of Davis.  Tambi was the only director to question her lack of experience.  Although Tambi admitted that he "ha[d] an issue with the candidate's background in Pharmaceutical Compliance," he did nothing further to pursue the matter.  None of the other Outside Directors did either.

> **f.**      **Spring 2014: The Board Ignores Serious Concerns Expressed by a Fellow Director, Stanley.**

181.   According to Babich's testimony in the Criminal Action, Stanley (the only director who was not a Kapoor loyalist) expressed concerns at an early 2014 board meeting based on information he had received from Napoletano regarding sales and marketing practice for Subsys.  According to Babich, Stanley told his fellow directors "***I think we're just turning a blind eye to a lot of these things***."  Following an argument back and forth, Kapoor told Stanley "***that he doesn't know what he's talking about***" and to "***shut the F up***."  Stanley cowered to Kapoor's directive, and the Outside Directors likewise failed to take any additional actions.

182.   After the meeting, Kapoor retaliated by downgrading Stanley's role at the company, and required that any future request by Stanley to travel to Insys meetings or conferences had to be personally approved by Kapoor.  The Outside

Directors did nothing in response to this retaliation against Stanley or the statements that he had expressed at the early 2014 board meeting.

> **g.   May 2014: The Board Learns About Criminal Charges, a Scathing Media Report, and Additional IRC Problems.**

183.   In May 2014, three developments highlighted the need for immediate action by the Outside Directors to ensure that Insys was complying with the law.

184.   <u>First</u>, a leading prescriber of Subsys nationwide, Dr. Awerbuch was arrested.  The Outside Directors received a summary of the charges on May 8, 2014. Awerbuch was charged with healthcare fraud and controlled substance distribution, and with writing prescriptions for controlled substances (including Subsys) outside the usual course of professional practice.  The summary presented to the board also identified Awerbuch as the number-one prescriber of Subsys in the country, with prescriptions more than six times greater than the next-closest prescriber.

185.   Despite the seriousness of the charges and the potential implications for Insys's sales and marketing practices, the Outside Directors reacted by simply downplaying the arrest and deferring to Kapoor and Babich.  For example, Tambi told Babich that he believed that the issue would "dissipate" quickly, and ***"not to over-react."***  Tambi separately emailed Kapoor and Babich, urging them to quickly work past the issue so that they could "get back to tendering [sic] the business ASAP—we should not allow the Business to be side-tracked."  Tambi further suggested that the Awerbuch indictment could be spun "as a normal growth

occurrence—a 'Learning/Teaching experience—here we have a start-up, young, fast growth Company/Business with a product of extraordinary Therapeutic efficacy . . . " Tambi added: "We know most of the unfortunate actions, where they occurred & how. I have no illusions that the Inspector's probe will surface the same issues and he is not inclined to cut us any slack." There is no indication that any of the other Outside Directors took the issue any more seriously than Tambi.

186. <u>Second</u>, just five days after the Outside Directors learned of and discussed Awerbuch's arrest, *The New York Times* published an article entitled "Doubts Raised About Off-Label Use of Subsys, a Strong Painkiller" on May 13, 2014. Babich and Kapoor received the article as soon as it was published, and Babich promptly forwarded it to the entire Insys board, including the Outside Directors.

187. The substance of *The New York Times* article should have been troubling to the Outside Directors, especially given the many "red flags" of possible unlawful sales and marketing practices already known to them. The article noted that "questions are emerging about how [Subsys] is being sold, and to whom." It further explained that behind the company's success "is an unusual marketing machine that may have pushed Subsys far beyond the use envisioned by the Food and Drug Administration." In support, the article cited interviews with several former salesforce members, who suggested that Insys had "aggressively marketed"

Subsys, including by paying the salesforce higher commissions for selling higher doses of the drug.  Finally, the article noted that "Subsys has sold surprisingly well given the drug is approved only for cancer pain, and given that only a small number of oncologists, who are typically responsible for treating their patients' pain, appear to be prescribing it."

188.   Yet again, the Outside Directors responded by deferring to Kapoor and Babich about how best to put a positive PR spin on the situation, rather than ensuring that Insys was operating in accordance with the law.   For example, Tambi, suggested—to the entire board—that the company should gather information that would "help[] us to prepare to explain" the practices, rather than fully investigate to ensure that Insys's sales and marketing practices were lawful.  Specifically, Tambi suggested that the company should search "for other Pharmaceuticals that have had a rapid 'Market Acceptance' especially in Cancer Therapy.  If so, Subsys's uptake is neither unique nor unusual.  We may be in good company here."  With respect to the Speaker Program, Tambi brushed aside any concern over that program, noting that "[s]peakers are necessary to educate & inform Physicians on the attributes of the drug—safety, efficacy, proper use, and other nuances of the drug—not to promote.  I am sure Insys is positioning this effectively."  None of the Outside Directors voiced any disagreement with Tambi's myopic views.

189.   A few weeks later, Insys's directors met for a telephonic board meeting on May 23, 2014, during which they discussed Awerbuch's arrest as well as *The New York Times* article.   Although Awerbuch's arrest implicated possible misconduct of Insys's salesforce representatives, Kapoor flatly informed his fellow directors that Insys was not going to terminate anyone.   Kapoor did so because he believed such actions would create whistleblowers.   Despite Awerbuch's alarming arrest and its implications of possible Insys salesforce wrongdoing, none of the Outside Directors objected to Kapoor's strategy.   Thus, Kapoor's desire to suppress whistleblowers was allowed to take precedence over uncovering the extent of the wrongdoing and protecting Insys.

190.   Third, during the same telephonic board meeting on May 23, 2014, the board (including the Outside Directors) discussed concerns of potential misconduct occurring within the IRC related to the practice of providing untrue information to insurance companies using a list of "tried-and-failed" medications that were not reflected in patients records.   On the call, Kapoor admitted that Insys was "running [the] IRC w/o full understanding of requirements," was "slow in responding" to issues at the IRC, and that the company "didn't act quickly enough."   Still, Kapoor advocated against shutting down the IRC prospectively, arguing that the action was "drastic," and would "blow up in their faces."   At the time, none of the Outside Directors objected to Kapoor's decision to continue the IRC's operations.   Nor did

the Outside Directors do anything to investigate; to install monitoring, control, or compliance mechanisms; or to take any other action to ensure that the IRC was operating lawfully.

### h. June 2014: The Board Hears New Concerns Raised by the Compliance Director.

191. In June 2014, the Outside Directors received troubling new information concerning the IRC from Babich's recently installed compliance director, Davis.

192. During a June 9, 2014 board meeting, Davis expressed her concerns regarding the IRC's practices. Despite her lack of experience, she identified significant issues when attending the IRC's new hire training, including:

- Davis observed IRC representatives speaking with insurance companies and "rattling off" medications a patient had tried and failed without having a chart in front of them. She discovered that the IRC personnel were quoting from the set list of "tried-and-failed" medications regardless of whether the patient had tried any of the medications on the list;

- Davis discovered the Q&A List and the "spiel," instructing IRC personnel to respond affirmatively if asked whether a patient suffered from breakthrough cancer pain—again regardless of the patient's actual diagnosis; and

- Davis learned that the IRC personnel were receiving bonuses tied to obtaining approvals from insurance companies. Despite her lack of experience, she immediately recognized that the company should not compensate in this manner because "it could potentially incentivize bad behavior to get the approval."

Davis reported her observations to the board, telling them: ***"I feel they are committing insurance fraud at the IRC."*** After her clear worries apparently fell on

deaf ears, Davis walked away feeling as though none of the Outside Directors was appropriately concerned. Her fears were justified; instead of responding to the warnings, the Outside Directors took no action, notwithstanding what Tambi described in an email as the "terrible tension and gloom" at the June 2014 board meeting.

### i.   <ins>**August 2014: The Board Hears Further Concerns from the Compliance Director, While an Internal Whistleblower Is Fired for Expressing Concerns.**</ins>

193.   In August 2014, concerns of potential illegality raised internally were yet again ignored by the Outside Directors on at least two occasions.

194.   <ins>First</ins>, Davis reiterated her concerns regarding possible insurance fraud involving the IRC at the August 7, 2014 board meeting. All of the directors attended the meeting, along with Del Fosse, Burlakoff, Gurry, and other members of management. During the meeting, the board was informed about several areas of concern for the company, including the IRC's practices and issues with the Speaker Program, including paid speaker events that occurred without any attendees.

195.   Yet despite being informed again of possible misconduct permeating the IRC and Speaker Program, the Outside Directors did nothing to follow up, investigate, or ensure that such practices were not continuing. Indeed, as Babich testified in the Criminal Action, it was clear that Davis had been "powerless" with respect to a large portion of the compliance problems that plagued the company.

196.  <u>Second</u>, just weeks later on August 25, 2014, Del Fosse informed Insys's board that Napoletano—who previously expressed his concerns about Insys's sales and marketing strategies to Stanley and others—had been forced out at the direction of Kapoor and Babich.  The Outside Director failed to inquire about the circumstances of Napoletano's termination or his claims regarding ongoing misconduct at the company involving Babich, Burlakoff, and Kapoor.

197.  Even a basic inquiry by the Outside Directors into the circumstances of Napoletano's termination would have revealed wrongdoing given that he was completely forthcoming in expressing his concerns.  Just earlier that month, Napoletano repeated his concerns about multiple compliance problems occurring within the company, which were recorded in an informal memorandum (and ultimately culminated in his termination).  Specifically, Napoletano stated that Babich was non-compliant, and "wanted nothing to do with compliance even after [the] subpoena [in December 2013] [was] served."  Napoletano also explained that Burlakoff "[wa]s telling speakers as recent as [the prior] week that if they write he will get them over $100k in speaker fees a year."  Napoletano further described how he was "forced by [Babich] and Dr. Kapoor to do an ROI calculation on the speaker program," and that many egregious activities were taking place in the marketing and sale of Subsys.  Later, in the Criminal Action, Napoletano testified that it was Kapoor's idea to track prescriptions written by Speaker Program participants

because he "wanted a positive ROI," and that it was Kapoor's plan to direct Insys salesforce representatives to urge doctors to prescribe Subsys at higher and higher doses and to "push the dose."

**j.      September 2014: The Board Receives a Criminal Subpoena Directed at the Company.**

198.   On September 8, 2014, Insys received a criminal subpoena from the United States Attorney's Office for the District of Massachusetts.  On September 12, 2014, Del Fosse notified the board of the criminal subpoena.

199.   In response to this subpoena, the Outside Directors took no action. They simply stood back and let Kapoor, Babich, and counsel acting largely under Kapoor's direction continue to steer the company's response.

**k.      May 2015: The Board Begins Meeting More Often, But Accomplishes Little and Pays Themselves for Their Do-Nothing Troubles.**

200.   By May 2015, with the company subject to a criminal subpoena, the Outside Directors recognized that they needed to at least give the appearance that they were paying attention to what was happening at Insys and agreed to start meeting more regularly.  But even then, the Outside Directors decided to pay themselves a "special meeting" bonus of $1,000 (in addition to their annual retainers) for each future board meeting or conference call related to the company's ongoing legal issues.  This move was way too little, way too late.  Even after they started meeting more regularly and paying more attention to the company's

burgeoning legal troubles, the Outside Directors continued to fail to take any effective steps to protect Insys and its stakeholders from unlawful activity.

**l.      June 2015: The Board Learns of a Guilty Plea Arising from the Company's Illegal Kickbacks.**

201.   On June 23, 2015, Heather Alfonso ("Alfonso")—a nurse practitioner in Connecticut—pleaded guilty to a single count of accepting $83,000 in kickbacks from Insys between January 2013 and March 2015.  Alfonso admitted that the money she received influenced her prescribing of Subsys.  Following this event, the Outside Directors realized that the status quo could no longer continue.  Alfonso's plea was an express public admission of bribery, and it would no longer be possible for the Outside Directors to completely ignore the possibility that such activity was possibly occurring at Insys.

202.   Alfonso's guilty plea was a particularly sensitive sticking point for Insys for another reason.  Natalie Levine ("Levine"), the salesforce member who sold Subsys to Alfonso, was Babich's wife.  As part of Alfonso's plea, she admitted that the Speaker Program payments that Levine organized on her behalf were veiled bribes.  Notably, Babich had begun dating Levine while she was engaging in the misconduct, and they married in or around March 2015, while Alfonso was being investigated by the government.

203.   During a board meeting on June 29, 2015, Kapoor provided a summary of Alfonso's guilty plea to the Outside Directors.  Following a discussion, the board

scheduled a telephonic board meeting for July 8, 2015.  The board further requested that Skadden and Del Fosse provide an update at that July meeting concerning the payments to Alfonso and the procedures necessary to determine whether similar activity was happening at Insys.

      **m.**     **<u>July 2015: The Board Is Informed That Insys Lacks Effective Controls and Has Terminated Burlakoff.</u>**

204.   During the ensuing board call on July 8, 2015 (in which all Defendants except Babich participated) to address Alfonso's guilty plea, Kapoor admitted that the company "***did not have as much control***" over sales representatives and the Speaker Program "***as we should have.***"   Kapoor added that the company was "doing a lot of work to see if [there were] other Heathers in [the] closet," (*i.e.*, if there were other prescribers like Heather Alfonso), apparently to reassure the board that management had the situation under control.

205.   Ultimately, in a misguided effort to help protect themselves from any fallout stemming from Alfonso's guilty plea, Insys's directors voted during the meeting to "re-constitute" the Special Committee that had purportedly been formed in December 2013—but which had entirely failed to meet or perform its designated role over the past eighteen months.  But even after resurrecting this committee, Insys's directors did nothing to ensure that it would function appropriately.

206.   After the Insys directors voted to "re-constitute" the Special Committee but before it had met, Kapoor (for self-serving reasons) terminated Burlakoff.

Kapoor made this determination not because of Burlakoff's involvement with the misconduct, but because Burlakoff spoke with a journalist about Insys's sales practices and was deemed "unstable."  In other words, Kapoor feared that Burlakoff would bring unwanted attention and scrutiny to rampant ongoing illegality implemented at Kapoor's direction.

207.   Del Fosse informed the board of Burlakoff's termination through an email on July 31, 2015.  With no pushback from the Outside Directors and at Kapoor's direction, Burlakoff was given severance in the form of a consulting agreement, pursuant to which Burlakoff was entitled to a bonus of almost $150,000, as well as continued vesting of his 192,500 shares of Insys stock that were subject to an option award under the company's option plan.   This Kapoor directed severance package kept Burlakoff quiet until he eventually cooperated with the government after pleading guilty in November 2018.

### n.      **August 2015: The Special Committee Finally Begins to Meet But Is Tainted, Ineffective, and Poorly Functioning.**

208.   In August 2015, the "re-constituted" Special Committee finally began to meet (more than eighteen months after it was first formed in December 2013).  Even then, however, the Special Committee was fundamentally flawed in several respects.

209.   First, the Special Committee did not act independently of Kapoor.  Instead, Kapoor frequently attended Special Committee meetings, often inserted

himself into discussions, and largely took control of the investigation.  He also remained intimately involved in the Special Committee's strategic decisions with respect to the regulatory investigations, employment decisions for individuals implicated by the investigation, and related matters.  Indeed, even after the board finally decided to hire a Chief Compliance Officer later in 2015, the Special Committee and Outside Directors deferred to Kapoor to select the candidate, even though the Special Committee determined that Kapoor's selection was less qualified than others.  In short, although Kapoor was not on the Special Committee and was directly implicated in the practices that were being investigated, he exercised a heavy hand over the Special Committee's activities.

210.  <u>Second</u>, the Special Committee did not have independent or effective counsel.  The Special Committee did not independently choose its own counsel, but was stuck with Skadden (at Kapoor's suggestion) and allowed Kapoor to ensure that he was made privy to any updates provided by Skadden regarding its response to the OIG Subpoena or its other investigatory work.  In fact, it was Kapoor himself—not the Special Committee—who would later review and direct outside counsel's internal investigation plan in early 2016.

211.  Moreover, Insys's general counsel, Del Fosse, kept Kapoor fully apprised of all aspects of the Special Committee's discussions and deliberations.  Often, Del Fosse discussed issues with Kapoor in advance of Special Committee

meetings so that Del Fosse could report to the committee members and to Skadden whether proposed courses of action would be blessed or opposed by Kapoor at any upcoming Special Committee meeting. These pre-Special Committee meeting liaisons significantly curtailed terminations of Insys employees implicated in misconduct because, according to Del Fosse, Kapoor was "not a huge fan of firing people," out of fear of creating whistleblowers.

212. <u>Third</u>, the Special Committee was also flawed due to its composition. It was comprised of Fourteau, Meyer, and Lapalme—each of whom had significant, pre-existing business and personal relationship with Kapoor.

> **o.    September to November 2015: The Board Terminates Babich as a Designated "Fall Guy."**

213. At a Special Committee meeting on September 18, 2015, as it became increasingly clear that Insys faced major legal troubles, the committee members questioned whether Babich could be terminated "for cause." Under Babich's employment agreement, "[w]hether a termination is for Cause shall be decided by the Board in its sole and exclusive judgment and discretion." Among other things, "Cause" included Babich's participation in a fraud, an act of dishonesty or other act of misconduct against the company, or his violation of any statutory or fiduciary duty owed to the company.

214. The determination of whether Babich could be terminated for cause had a significant financial impact on Insys. If Babich were terminated "for cause," then

he would not be entitled to any severance payments.  Further, all of his stock options—both vested and unvested—under the company's option plans would have been terminated immediately, and he would have been prohibited from exercising them.  Thus, terminating Babich for cause would have saved tens of millions of dollars for the company.

215.  For Kapoor, however, terminating Babich for cause was a risky maneuver because Babich, as Kapoor's main co-conspirator, could easily turn against him.  Accordingly, when Kapoor finally determined that it was time for Babich to go due to the government's investigation into Babich's criminal behavior, Kapoor sought to protect himself by acting proactively, irrespective of the Special Committee's deliberations.  On October 27, 2015, one day after Kapoor told Babich that he was *"going to be the fall guy,"* Kapoor informed the Outside Directors by email that he had unilaterally determined to offer Babich a severance package as one "last favor."  Kapoor insisted on this severance package even though Babich had been well compensated during his tenure as CEO, receiving $2,899,420 in 2013, $2,539,906 in 2014, and $3,862,000 in 2015.

216.  Three days later in an email on October 30, 2015, Del Fosse informed the Special Committee that Babich could receive a severance package for only a "non-Cause departure event."  Del Fosse also indicated that the severance agreement was subject to Compensation Committee approval at the next Board meeting, to be

held on November 3, 2015.  The minutes for that board meeting reflect no substantive discussion of whether Babich should be terminated "for cause," however, as the Outside Directors essentially rubber-stamped Kapoor's unilateral decision from a few days prior to give Babich a severance package.  The Outside Directors deferred to Kapoor's decision even though at that same board meeting, an update on pending investigations indicated that there were ample grounds to terminate Babich "for cause," which would have resulted in the company not having to pay any severance to him.

217.   Babich was thereafter given a hefty severance package worth more than $20 million in cash and stock, including one year of salary ($3,862,000); a pro-rated bonus for 2015 ($443,013), accrued vacation ($24,230), and the accelerated vesting of Babich's unvested stock options (worth over $20 million at the time).

218.   At bottom, the decision to pay Babich a severance was not in Insys's best interest, but rather was a decision made to protect Kapoor.  As Del Fosse put it in an email to the board prior to when the decision was made, the company took ***"very seriously protecting [the] Board and Dr. K[apoor],"*** and that "any decision we make about . . . Mike [Babich] should take that into consideration," since he "could exercise self-protective behavior, go after Dr. K[apoor]."  Remarkably, the Outside Directors approved Kapoor's own self-protective decision to pay a

severance to silence Babich (which worked until Babich finally pleaded guilty in January 2019).

**p.     November 2015: The Board Defers to Kapoor's Decision to Install Himself as CEO.**

219.   After sacrificing his primary co-conspirator in the criminal scheme (Babich), Kapoor promptly leveraged his relationships with the Outside Directors to have himself installed as CEO.  When Kapoor put himself forward for the CEO role, the Outside Directors hardly blinked; they did not consider any other potential candidates for the position, nor did they discuss whether it was even appropriate for Kapoor to become CEO in light of the likelihood of misconduct at the company, Kapoor's own apparent role in that misconduct, or the status of the government's investigations into that misconduct.

220.   The Outside Directors' loyalty and deference to Kapoor in allowing him to become CEO was particularly baffling given that they recognized and acknowledged by that time that Insys was a complete and utter mess, despite Kapoor's prior assurances.  As Fourteau confessed in an August 28, 2015 email to outside counsel:

> "***It is clear that the whole monitoring in 2014 was very loose***.  The evaluation from the reps should have acted as ***huge red signals***.  The list of attendees was suspicious.  We as a board were given some metrics re the Speaker's program but not these ones.  Were they followed?  ***I suspect nobody was looking at them***."

Then in an October 29, 2015 email chain involving Fourteau, LaPalme, and Meyer,

those Outside Directors discussed the need for a "compliance committee" to remain in operation "until things are fully under control."  In short, as Babich testified in the Criminal Action, there was "no major compliance initiative" at the company.

221.  Yet the Outside Directors nevertheless allowed Kapoor to appoint himself as CEO.  And they largely gave him free rein, especially over critical personnel decisions, including whether to terminate Insys employees who engaged in misconduct.  As alleged above, Kapoor generally wanted to keep employees around to reduce the risk of terminated employees becoming whistleblowers.  To further prevent whistleblowers and cooperation with governmental investigations, Kapoor caused Insys to advance defense costs for employees under investigation or indictment, including employees who were not directors or officers and who did not otherwise have any possible entitlement to indemnification or advancement.  This behavior was ultimately self-serving, given that Kapoor directed, participated in, or knew about the misconduct of his subordinates at the company.

       **q.**    **December 2016 to October 2017: The Board Allows Kapoor to Remain on the Board Until He is Indicted.**

222.  In December 2016, Insys's outside counsel spoke with the DOJ's lead investigator, Nat Yeager.  Yeager informed Insys's counsel that the DOJ was particularly interested in Kapoor's involvement in the ROI Analysis.  According to Yeager, the DOJ could not "move forward with a settlement with the company if the 60% owner was directly involved in the ROI analysis and speaker program."

87

223.   Del Fosse forwarded a summary of the telephone call to Kapoor and the Special Committee.  Although Kapoor resigned as CEO and chairman of the board in January 2017, the Special Committee members allowed Kapoor to remain a board member and to exercise continued leadership of the company's response to the government's investigation.  During this time, the Special Committee still took no steps to investigate Kapoor or his prior involvement in the ROI Analysis and Speaker Program.

224.   In October 2017, Kapoor was indicted for criminal racketeering related to the sales and marketing plan he implemented at Insys.  Following his indictment, Kapoor finally resigned from the Insys board.  In other words, the Outside Directors did nothing to prevent Kapoor from running the company as he saw fit, regardless of any illegality, until Kapoor was indicted more than five long and devastating years after his criminal scheme commenced.

## C.    THE CRIMINAL SCHEME DAMAGES AND DESTROYS INSYS.

225.   The Kapoor-Babich scheme, as enabled by the Outside Directors, caused Insys to sustain substantial damages, including: (a) illegal payments to doctors through the Speaker Program; (b) awards, fines, and liabilities imposed in civil and criminal proceedings against the company; (c) fees, expenses, and costs incurred by the company in those civil and criminal proceedings; (d) fees, expenses, and costs advanced by the company in various civil and criminal proceedings against

its former directors, officers, and other employees, including Kapoor and Babich; (e) compensatory and severance payments by the company to its former directors, officers, and other employees, including Defendants, who had engaged in the misconduct; (f) fees, expenses, and costs incurred by the company in its bankruptcy case; and (g) liabilities owed to the many third-party victims of the scheme, which became creditors of the company in its bankruptcy case.

226.   <u>First</u>, Insys incurred significant damages in the form of illegal payments to doctors through the Speaker Program.  The company paid nearly $24 million to doctors involved in the illicit Speaker Program, including: (a) $2.8 million in 2013; (b) $7.7 million in 2014; and (c) $13.3 million in 2015.  Insys never would have made these improper payments had Defendants complied with their fiduciary duties.

227.   <u>Second</u>, Insys suffered enormous awards, fines, and liabilities imposed in civil and criminal proceedings.  For example, in settlements with various state and federal authorities, the company incurred almost $235 million in damages, including: (a) nearly $10 million in settlements with various state governments, including Illinois, Oregon, Massachusetts, and New Hampshire; and (b) the $225 million settlement with the federal government in 2019.  The company never would have incurred these crippling liabilities had Defendants properly discharged their fiduciary duties.

228.  Third, Insys incurred substantial fees, expenses, and other costs in connection with the multiple civil and criminal proceedings against the company. Indeed, Insys paid a staggering $55 million in fees and expenses to dozens of professional firms related to those proceedings.  The company never would have sustained these damages had Defendants complied with their fiduciary duties.

229.  Fourth, Insys advanced additional fees, expenses, and other costs in connection with civil and criminal proceedings against its former directors, officers, and other employees, including Kapoor and Babich.  In other words, Insys paid to defend the individuals who had destroyed the company.  Specifically, the company advanced nearly $28 million in such defense costs, including: (a) over $12.1 million in defense costs for Kapoor; and (b) over $6.7 million in defense costs for Babich. Insys never would have made these payments had Defendants properly discharged their fiduciary duties.

230.  Fifth, Insys incurred additional damages through compensatory and severance payments to its former directors, officers, and other employees, including Defendants, who had engaged in the underlying misconduct.  For instance, Kapoor collected more than $859,000 in fees, salary, and other compensation from Insys. Babich collected nearly $9.2 million in bonuses, salary, and other compensation from the company.  He also received over $500,000 through a severance payment. And  the  Outside  Directors  collected  over  $1.6  million  in  fees  and  other

compensation from Insys, while they were simultaneously breaching their fiduciary duties to the company.

231.  Sixth, after collapsing under the weight of the Kapoor-Babich scheme, Insys incurred more than $25 million in fees, expenses, and other costs in its bankruptcy case.  The company, of course, would not have commenced that case and would not have incurred those fees, expenses, and costs had Defendants complied with their fiduciary duties.

232.  Seventh, Insys incurred billions of dollars of legal liabilities to third parties as a result of its vicarious liability for the wrongful acts perpetrated by Kapoor, Babich, and those acting under their direction (wrongful acts that were enabled by the Outside Directors and their failures).  At the time of its bankruptcy filing, Insys faced:

- Hundreds of actions (many of which were consolidated in MDL 2804) for wrongful death, negligence, product liability, insurance fraud and harm caused to governmental entities stemming from the opioid crisis;

- Approximately 200 actions filed by governmental entities outside of MDL 2804; and

- Over 27 personal injury lawsuits, several of which sought class action certification.

The billions of dollars of legal exposure, along with the $225 million DOJ settlement, led to Inys's bankruptcy filing.

233. Although the company once had a market capitalization of more than $2.2 billion, Insys liquidated its assets for only $30 million in cash and $30 million in future royalties and other payments during the bankruptcy case. In its confirmed Plan in the bankruptcy case, Insys conservatively estimated the following liabilities: (a) $50 million in Class 4 claims (general unsecured claims); (b) $258 million in Class 5 claims (insurance-related claims); (c) $117 million in Class 6 claims (hospital and certain monitoring claims); (d) $283 million in Class 7 claims (federal claims); and (e) $597 million in Class 8 claims (state, municipality, and tribe claims). The company never would have incurred those liabilities had Defendants properly discharged their fiduciary duties.

234. Insys, therefore, incurred almost $150 million in total out-of-pocket damages, plus billions of dollars in additional losses and liabilities, as a direct and proximate result of the misconduct by Defendants.

**D.    BABICH ENGAGES IN INSIDER TRADING.**

235. In addition to his misconduct described above, Babich misused his position as a fiduciary of the company to trade on inside information. From January 2014 through March 2015, Babich sold $29,610,157 worth of shares of his Insys common stock based upon his knowledge and possession of material, non-public information.

236.   During this period, the company's quarterly revenues increased by 232% from $39.2 million in the fourth quarter of 2013 to $91.1 million in the third quarter of 2015. This rapid increase in revenues for Subsys was driven primarily by the improper sales and marketing practices described above, which were concealed from the market. The increase in revenue correlated with a more than 300% increase in Insys's stock price from $13.04 on December 13, 2013 to $40.01 on June 19, 2015. Babich took advantage of the fact that the company's revenues were rising dramatically—due to improper sales and marketing practices known to them, but not the market—to sell more than $29.6 million worth of Insys stock before the misconduct was discovered by the public.

237.   By early 2014, Babich knew the material non-public fact that the company's sales revenues were dependent upon improper sales activities and practices at the IRC. These improper practices—which were undoubtedly material—were not made public until years later.

238.   Therefore, from January 2014 through well after March 2015, Babich possessed material, non-public information concerning improper activities at Insys, and were prohibited from trading the company's stock based on that information. Babich chose to misuse it for his own personal gains by selling shares of Insys common stock at a time when he could obtain significant returns due to the public's

ignorance of extensive wrongdoing at Insys, wrongdoing that Babich himself spearheaded.

239.   Accordingly, Babich possessed material non-public information at the time that he sold his shares of Insys common stock during the period of January 2014 through March 2015.   As indicated in Form 4 filings with the Securities and Exchange Commission, Babich did not effectuate any of these trades pursuant to a Rule 10b5-1 plan.

240.   Babich, of course, played an integral role in implementing, overseeing, and executing the company's improper sales and marketing practices (section A.3, *supra*).   Through the directions that he provided to subordinates, such as Burlakoff and Napoletano, Babich—along with Kapoor—was the prime orchestrater of the unlawful Speaker Program.   Further, Babich had regular communications with, and provided directions to, Gurry concerning the IRC's fraudulent operations and the methods employed by the prior authorization specialists.   Babich capitalized on this insider knowledge by trading shares of Insys common stock at inflated stock prices.

241.   The following table summarizes the dates upon which Babich traded shares of Insys common stock based upon this material, non-public information, as well as the proceeds he received from those trades:

| Date of Trade | Total Proceeds |
|---|---|
| March 5, 2014 | $21,512,122 |
| October 21, 2014 | $803,404 |
| November 3, 2014 | $279,504 |
| November 4, 2014 | $2,813,223 |
| March 16, 2015 | $2,814,473 |
| March 17, 2015 | $1,387,441 |
| **Total** | **$29,610,157** |

## IV.   CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duties
### (Against Kapoor)

242.   The Trustee re-alleges the allegations set forth above.

243.   As a director and officer of the company, Kapoor owed fiduciary duties to Insys and its stockholders.  He also owed fiduciary duties as the company's controlling stockholder.  By reason of his fiduciary relationships, Kapoor owed the highest obligation of due care, loyalty, and good faith to Insys and its stockholders with respect to the company's affairs, including its compliance with laws and regulations governing the sale and marketing of Subsys.

244.   Kapoor consciously and repeatedly breached his fiduciary duties to Insys and its stockholders in multiple ways, including:

   a.   implementing and executing the company's improper sales and marketing plan, including the effective-dose scheme, Speaker Program, ROI Analysis, and IRC, thereby causing the company to violate positive law;

95

b.   engaging in illegal conduct and other misconduct with respect to the company's sales and marketing plan, including the effective-dose scheme, Speaker Program, ROI Analysis, and IRC;

c.   failing to act in the face of a known duty to act to prevent illegal conduct and other misconduct with respect to the company's sales and marketing plan, including the effective-dose scheme, Speaker Program, ROI Analysis, and IRC;

d.   failing to implement a reasonable oversight and compliance program on key issues of risk for the company, such as the Speaker Program and IRC;

e.   failing to actively monitor or oversee the compliance program when it finally was instituted, thus disabling the company's directors from being informed of risks or problems requiring their attention;

f.   disregarding his duty to investigate repeated red flags regarding possible illegality and other misconduct and to remedy any misconduct uncovered;

g.   acting in bad faith and putting the interests of himself and others above the interests of the company and all of its stockholders;

h.   approving or allowing severance payments to former employees (such as Babich, Burlakoff, and others) who had engaged in illegal conduct and other misconduct with respect to the company's sales and marketing plan, including the effective-dose scheme, Speaker Program, ROI Analysis, and IRC; and

i.   approving or allowing advancement of defense costs to former directors, officers, and employees (such as Babich, Burlakoff, and others) who had engaged in illegal conduct and other misconduct with respect to the company's sales and marketing plan, including the effective-dose scheme, Speaker Program, ROI Analysis, and IRC.

245.   As a direct and proximate result of his breaches of fiduciary duty, Kapoor caused Insys to sustain substantial damages, including: (a) awards, fines, and penalties imposed against Insys in civil and criminal proceedings; (b) fees, expenses, and costs incurred by Insys in civil and criminal proceedings; (c) fees, expenses, and costs advanced by Insys in civil and criminal proceedings against its former directors, officers, and other employees; (d) severance payments by Insys to its former employees who had engaged in illegal conduct and other misconduct; (e) fees, expenses, and costs incurred by Insys in its bankruptcy case; and (f) liabilities incurred to victims who became creditors of Insys in its bankruptcy case.

246.   Accordingly, Kapoor is liable to the Trustee, as successor-in-interest to Insys, for significant damages in an amount to be proven at trial.  The Trustee has no adequate remedy at law.

## COUNT II
### Breach of Fiduciary Duties
### (Against Babich)

247.   The Trustee re-alleges the allegations set forth above.

248.   As a director and officer of the company, Babich owed fiduciary duties to Insys and its stockholders.  By reason of his fiduciary relationships, Babich owed the highest obligation of due care, loyalty, and good faith to Insys and its stockholders with respect to the company's affairs, including its compliance with laws and regulations governing the sale and marketing of Subsys.

249.    Babich consciously and repeatedly breached his fiduciary duties to Insys and its stockholders in multiple ways, including:

a.    implementing and executing the company's improper sales and marketing plan, including the effective-dose scheme, Speaker Program, ROI Analysis, and IRC, thereby causing the company to violate positive law;

b.    engaging in illegal conduct and other misconduct with respect to the company's sales and marketing plan, including the effective-dose scheme, Speaker Program, ROI Analysis, and IRC;

c.    failing to act in the face of a known duty to act to prevent illegal conduct and other misconduct with respect to the company's sales and marketing plan, including the effective-dose scheme, Speaker Program, ROI Analysis, and IRC;

d.    failing to implement a reasonable oversight and compliance program on key issues of risk for the company, such as the Speaker Program and IRC;

e.    failing to actively monitor or oversee the compliance program when it finally was instituted, thus disabling the company's directors from being informed of risks or problems requiring their attention;

f.    disregarding his duty to investigate repeated red flags regarding possible illegality and other misconduct and to remedy any misconduct uncovered;

g.    acting in bad faith and putting the interests of Kapoor and others above the interests of the company and all of its stockholders; and

h.    approving or allowing severance payments to former employees (such as Burlakoff and others) who had engaged in illegal conduct and other misconduct with respect to the company's sales and marketing plan, including the effective-dose scheme, Speaker Program, ROI Analysis, and IRC.

250.  As a direct and proximate result of his breaches of fiduciary duty, Babich caused Insys to sustain substantial damages, including: (a) awards, fines, and penalties imposed against Insys in civil and criminal proceedings; (b) fees, expenses, and costs incurred by Insys in connection with civil and criminal proceedings; (c) fees, expenses, and costs advanced by Insys in connection with civil and criminal proceedings against its former directors, officers, and other employees; (d) severance payments by Insys to its former employees who had engaged in illegal conduct and other misconduct; (e) fees, expenses, and costs incurred by Insys in its bankruptcy case; and (f) liabilities incurred to victims who became creditors of Insys in its bankruptcy case..

251.  Accordingly, Babich is liable to the Trustee, as successor-in-interest to Insys, for significant damages in an amount to be proven at trial.  The Trustee has no adequate remedy at law.

<u>**COUNT III**</u>
**Breach of Fiduciary Duties**
**(Against the Outside Directors)**

252.  The Trustee re-alleges the allegations set forth above.

253.  As directors of the company, the Outside Directors owed fiduciary duties to Insys and its stockholders.  By reason of their fiduciary relationships, the Outside Directors owed the highest obligations of good faith and loyalty to Insys and

its stockholders with respect to the company's affairs, including its compliance with

laws and regulations governing the sale and marketing of Subsys.

254.  The Outside Directors consciously and repeatedly breached their

fiduciary duties to Insys and its stockholders in multiple ways, including:

a.  failing to prevent the company from violating positive law with respect to its improper sales and marketing plan, including the effective-dose scheme, Speaker Program, ROI Analysis, and IRC;

b.  failing to act in the face of a known duty to act to prevent illegal conduct and other misconduct with respect to the company's sales and marketing plan, including the effective-dose scheme, Speaker Program, ROI Analysis, and IRC;

c.  failing to implement a reasonable oversight and compliance program on key issues of risk for the company, such as the Speaker Program and IRC;

d.  failing to actively monitor or oversee the compliance program when it finally was instituted, thus disabling the company's directors from being informed of risks or problems requiring their attention;

e.  disregarding their duty to investigate repeated red flags regarding possible illegality and other misconduct and to remedy any misconduct uncovered;

f.  acting in bad faith and putting the interests of Kapoor and others above the interests of the company and all of its stockholders, including by allowing Kapoor to manage the company's investigation of its sales and marketing practices;

g.  approving or allowing severance payments to former employees (such as Babich, Burlakoff, and others) who had engaged in illegal conduct and other misconduct with respect to the

company's sales and marketing plan, including the effective-dose scheme, Speaker Program, ROI Analysis, and IRC;

h.    approving or allowing advancement of defense costs to former directors, officers, and employees (such as Kapoor, Babich, Burlakoff, and others) who had engaged in illegal conduct and other misconduct with respect to the company's sales and marketing plan, including the effective-dose scheme, Speaker Program, ROI Analysis, and IRC; and

i.    with respect to Fourteau, Meyer, and Lapalme, failing to satisfy their Special Committee obligations, including by not meeting at all for over 18 months after the committee's formation.

255.   As a direct and proximate result of their breaches of fiduciary duty, the Outside Directors caused Insys to sustain substantial damages, including: (a) awards, fines, and penalties imposed against Insys in civil and criminal proceedings; (b) fees, expenses, and costs incurred by Insys in connection with civil and criminal proceedings; (c) fees, expenses, and costs advanced by Insys in connection with civil and criminal proceedings against its former directors, officers, and other employees; (d) severance payments by Insys to its former employees who had engaged in illegal conduct and other misconduct; (e) fees, expenses, and costs incurred by Insys in its bankruptcy case; and (f) liabilities incurred to victims who became creditors of Insys in its bankruptcy case.

256.   Accordingly, the Outside Directors are liable to the Trustee, as successor-in-interest to Insys, for damages in an amount to be proven at trial.  The Trustee has no adequate remedy at law.

## COUNT IV
### Corporate Waste
### (Against All Defendants)

257.  The Trustee re-alleges the allegations set forth above.

258.  As directors and/or officers of the company, Defendants caused Insys to waste its corporate assets in several ways, including:

      a.     approving or allowing severance payments to former employees (such as Babich, Burlakoff, and others) who had engaged in illegal conduct and other misconduct with respect to the company's sales and marketing plan, including the effective-dose scheme, Speaker Program, ROI Analysis, and IRC; and

      b.     approving or allowing advancement of defense costs to former directors, officers, and employees (such as Kapoor, Babich, Burlakoff, and others) who had engaged in illegal conduct and other misconduct with respect to the company's sales and marketing plan, including the effective-dose scheme, Speaker Program, ROI Analysis, and IRC.

259.  These transactions were so one-sided that no business person of ordinary, sound judgment, particularly persons such as Defendants who knew about the underlying illegality and/or other misconduct, could conclude that the company received adequate consideration in exchange for these transactions.  Rather, these transactions were unconscionable and constituted waste.

260.  As a result of the waste of corporate assets, Defendants are liable to the Trustee, as successor-in-interest to Insys, for damages in an amount to be proven at trial.  The Trustee has no adequate remedy at law.

## COUNT V
### *Brophy* Claim
### (Against Babich)

261.   The Trustee re-alleges the allegations set forth above.

262.   As a director and officer of the company, Babich owed fiduciary duties to Insys and its stockholders, including the duty of loyalty.

263.   Babich breached his duty of loyalty by selling his Insys common stock, while in possession of material, non-public information about the company.  Babich was motivated, in whole or in part, by the substance of that information.

264.   Specifically, from March 2014 to March 2015, Babich sold a significant amount of his Insys common stock, receiving more than $29.6 million in proceeds.  At the time that he sold his stock, Babich knew that Insys was engaging in improper sales and marketing practices, which had the effect of substantially inflating the company's revenues.

265.   Insys's improper sales and marketing practices represented material, non-public information.  This information was proprietary information belonging to Insys regarding its business and financial condition.  Nonetheless, Babich used this proprietary and material, non-public information for his own benefit when he sold his Insys common stock.  Indeed, Babich's sales of the stock were motivated, in whole or in part, by this information.

266.   Accordingly, the Trustee, as successor-in-interest to Insys, is entitled to

103

the imposition of a constructive trust and disgorgement of any profits obtained by Babich through his sales of the stock.  The Trustee has no adequate remedy at law.

**COUNT VI**
**Unjust Enrichment**
**(Against Babich)**

267.   The Trustee re-alleges the allegations set forth above.

268.   To the extent that Count V fails, Babich has been unjustly enriched as a result of his sales of Insys common stock, even if he breached no cognizable duty.

269.   Babich was involved in Insys's unlawful sales and marketing schemes, which resulted in Insys reporting inflated revenues.  These inflated revenues allowed Babich to sell his stock—which he received from Insys—at a higher price.

270.   It would be against equity and good conscience for Babich to retain the benefits of his sales of Insys stock.   Accordingly, the Trustee, as successor-in-interest to Insys, is entitled to recover the amount by which Babich has been unjustly enriched, including any profits obtained by Babich through his sales of the stock. The Trustee has no adequate remedy at law.

**V.    PRAYER FOR RELIEF**

WHEREFORE, the Trustee prays for judgment as follows:

a.    finding that Defendants breached their fiduciary duties of loyalty and good faith to Insys and its stockholders;

b.    awarding actual, compensatory, rescissory, consequential, and other damages against Defendants for breaching their fiduciary duties in an amount to be determined at trial;

104

c.      awarding restitution from Defendants and ordering them to disgorge (i) all benefits, salaries, and other compensation paid to them while they were breaching their fiduciary duties; (ii) all profits and proceeds received by them while they were breaching their fiduciary duties; and (iii) all advancements of defense costs and other similar payments for their benefit;

d.      awarding pre-judgment and post-judgment interest at the maximum rate permitted by law or equity;

e.      awarding reasonable attorney's fees and expenses, together with costs of court, in connection with this action; and

f.      granting such other relief as the Court deems just and proper.

Dated:  July 26, 2023

REID COLLINS & TSAI LLP

*/s/ Norman M. Monhait*

Norman M. Monhait (#1040)
300 Delaware Avenue, Suite 770
Wilmington, DE 19801
(302) 467-1765
nmonhait@reidcollins.com

OF COUNSEL:

William T. Reid IV
Keith Y. Cohan
Ryan M. Goldstein
Morgan M. Menchaca
REID COLLINS & TSAI LLP
1301 S. Capital of Texas Hwy,
Suite C300
Austin, TX 78746
(512) 647-6100

*Counsel for William H. Henrich,*
*as Trustee of the Insys Liquidation Trust*

Eric D. Madden
Michael J. Yoder
REID COLLINS & TSAI LLP
1601 Elm Street, Suite 4200
Dallas, TX 75201
(214) 420-8900

# EXHIBIT 2

## Separation Agreement

This Separation Agreement ("**Agreement**") is entered into as of November 4, 2015 (the "**Execution Date**") by and between Insys Therapeutics, Inc., a Delaware corporation, ("**Insys**") on behalf of itself, its subsidiaries and other corporate affiliates and each of their respective employees, officers, directors, owners, shareholders and agents (collectively referred to herein as, the "**Insys Group**"), and Michael L. Babich ("**Babich**") (Insys and Babich are collectively referred to herein as the "**Parties**").

WHEREAS, Babich and the Company have agreed that his employment shall terminate, which termination is without "Cause" as set forth in his Amended and Restated Employment Agreement with Insys as dated April 18, 2013 (his "**Employment Agreement**");

WHEREAS, Babich's last day of employment with Insys is November 4, 2015 (the "**Separation Date**"); and

WHEREAS, the Parties hereto, in connection with Babich's departure, wish to clarify other terms, conditions and obligations of the Parties in connection with Babich's separation.

NOW, THEREFORE, in consideration of the promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which each Party acknowledges, the Parties agree as follows:

After the Separation Date, Babich will not represent himself as being an employee, officer, agent or representative of Insys for any purpose as of the Separation Date. Without limiting the foregoing, Babich specifically agrees to update any and all social media accounts Babich accesses, uses or maintains to reflect the fact that Babich is no longer employed by Insys, as soon as reasonably practicable but in all events within fourteen (14) days of the Separation Date. For purposes of this paragraph, social media accounts include but are not limited to Facebook, LinkedIn, Twitter and Four Square. The Separation Date will be the employment termination date for Babich for all purposes and, except as specifically set forth in this Agreement, Babich will no longer be entitled to any further compensation, monies or other benefits from Insys, including coverage under any benefits plans or programs sponsored by Insys.

1.    <u>Insys' Waiver and Release and Babich's Representations and Agreements Related to Separation</u>.
    b

(a)    *Insys Release.* Insys, on behalf of itself, expressly waives and releases any and all claims against Babich that may be waived and released by law with the exception of claims arising out of or attributable to (a) events, acts or omissions taking place after the Parties' execution of the Agreement; (b) Babich's breach of any terms and conditions of the Agreement and (c) Babich's criminal activities or intentional misconduct occurring during Babich's employment with Insys. Insys specifically represents, warrants and confirms that: (a) it has no claims, complaints or actions of any kind filed against Babich with any court of law, or local, state or federal government or agency; and (b) it is not aware of, without any independent investigation or inquiry, any criminal activities or intentional misconduct engaged in by Babich in relation to Insys' business.

(b)    *Babich's Representations.* In exchange for Insys' waiver and release and the consideration described in this Section 1, which Babich acknowledges to be good and valuable

1

consideration for his obligations hereunder, Babich hereby represents that he intends to and hereby does fully settle any and all claims he may have against the Insys Group as a result of his hire, employment or separation from employment with Insys. Babich specifically represents, warrants and confirms that: (a) he has no claims, complaints or actions of any kind filed against the Insys Group with any court of law, or local, state or federal government or agency; (b) he has been properly paid for all hours worked for Insys, and that all commissions, bonuses and other compensation due to him has been paid, with the exception of (i) his final payroll check for his salary through the Separation Date above, which will be paid on the next regularly scheduled payroll date and (ii) any options to purchase Insys' common stock under any of Insys' option plan(s) which shall be governed by the terms of the applicable plan document and as specifically provided herein; and (c) he has not engaged in, and is not aware of, any unlawful conduct in relation to the business of Insys.

If any of these statements are not true, Babich cannot sign this Agreement and must notify Insys immediately, in writing, of the statements that are not true. Such notice will not automatically disqualify Babich from receiving these benefits, but will require Insys' review and consideration.

(c)     *Future Cooperation.* At the request of Insys, Babich agrees to execute any documents reasonably requested to effectuate or to facilitate his termination(s) and the transition of any such positions or responsibilities to other employees of the Insys. Babich also agrees that his termination and departure from his position(s) from Insys is not because of a disagreement with the Insys Group on any matter relating to Insys's operations, legal proceedings, governmental investigations, policies or practices.  Babich agrees that Babich will not voluntarily provide assistance, information, encouragement, or advice, directly or indirectly (including through agents or attorneys), to any person or entity in connection with any claim by or against the Insys, nor shall Babich induce or encourage any person or entity to do so.  The foregoing sentence shall not prohibit Babich from testifying truthfully under subpoena.  Babich warrants that he has not previously provided assistance, information, encouragement, or advice, directly or indirectly, to any person or entity in connection with any claim by or against Insys. Babich agrees to provide (voluntarily and without legal compulsion) prompt cooperation and accurate and complete information to Insys in the event of litigation involving Insys or its officers or directors and to respect and preserve all privileges held by or available to Insys.  Insys agrees to reimburse Babich for his reasonable travel costs spent consulting with and traveling to any litigation-related proceeding at the request of Insys.  Babich agrees to furnish, within seven (7) business days of its receipt, a copy of any subpoena, written request or inquiry, court order, written demand, CID or similar document related to his  employment or board of director service at Insys to the General Counsel of Insys at 1333 South Spectrum Blvd. Chandler, AZ 85286. Only if, and always consistent with, the Board's request, Babich shall actively and properly transition the responsibilities he held at Insys to other employees of Insys but only as directed by the Board of Insys which may actively be assisting in the retention of the Insys sales force and Insys leadership team in the sales force and customer and health care professionals relationships that Insys had during his employment with Insys.

(d)     *Acceleration of Babich's options.* In consideration for Babich's release set forth herein and subject to Babich having not revoked his signature prior to the Effective Date, Insys agrees to the accelerated vesting of unvested shares subject to any outstanding stock options granted to Babich, such that, on the Effective Date (as defined below), Babich shall be vested in one hundred percent (100%) of the shares subject to such option awards under the Insys' options plan(s).

2

(e)    *Executive Equity Ownership.* For the sake of clarity, as of the Separation Date, the Parties agree that Babich owns 421,572 shares of Insys' common stock and 1,287,500 shares subject to option awards under Insys' option plan(s) and is not entitled to any other equity or right to equity in Insys. Babich remains eligible for participation in Insys' option and employee stock purchase plans up to the Separation Date. The Parties agree that except as specifically modified by this Agreement, all terms, conditions, and limitations applicable to the shares and option awards will remain in full force and effect pursuant to the applicable stock option agreement(s) and stock option plan(s). Babich shall have until the second anniversary of the Separation Date or the expiration date of the original term of the applicable option award, whichever date is earlier, to exercise any part or all of his option awards. Babich hereby acknowledges that the amendment of his option awards under this Agreement may disqualify any options that were previously considered "incentive stock options" under Section 422 of the Internal Revenue Code of 1986, as amended (the "Code") and Babich hereby consents to such amendment of the terms applicable to the option awards. Babich is advised to seek independent legal advice with respect to tax and securities law issues regarding the option awards, this amendment of the option awards, and any exercise or sale of Insys' stock Babich may make and by executing this Agreement, Babich expressly acknowledges that he has consulted with independent advisors regarding these issues or has knowingly and voluntarily declined to do so.

(f)    *Incurred Expense Reimbursement.* Insys shall pay Babich any appropriate expense reimbursement request incurred prior to the Separation Date, if any, to be submitted by Babich within thirty (30) days after the Separation Date (with supporting documentation as required by Insys consistent with existing Insys policies and procedures) and paid by Insys within thirty (30) days after submission by Babich (assuming the reimbursement request is properly submitted consistent with Insys policies and procedures and the expenses are otherwise deemed proper by Insys).

(g)    *Severance Payments.* Insys shall make severance payments to Babich in the form of continuation of Babich's Base Salary as in effect on the Separation Date for a period of 12 months, paid on the Company's scheduled payroll dates, beginning on the first payroll date following the Effective Date of this Agreement. Additionally, Insys shall pay Babich, on the first payroll date following the Effective Date of this Agreement, (i) a lump sum payment of $24,230.77, equal to 120 hours of vacation (which the parties have agreed is the unused vacation benefits through the date of termination that Babich is entitled to pursuant to his Employment Agreement) and (ii) a lump sum severance payment of $443,013.70, which is equivalent to his annual target bonus for 2015 as established by the Board of Directors ($525,000), prorated for the number of days Babich was employed by Insys in 2015,. All payments made pursuant to this Section 1(g) shall be subject to required withholdings.

(h)    *Resignation as a Director.* Effective as of the Separation Date, Babich resigns from any and all positions Babich holds or has previously held on the Board of Directors of Insys, and Insys accepts such resignation.

(i)    *Indemnification and Attorney Fees.* Insys agrees to continue to provide Babich the applicable indemnification coverage it is legally permitted and contractually required to provide pursuant to his Indemnity Agreement with Insys dated March 21, 2011 (the "**Indemnification Agreement**"). In addition, Babich shall be entitled to any tail coverage under Insys's directors and officers insurance coverage if and as applicable to his service as an officer and/or director of Insys prior to the Separation Date. In addition, Insys shall pay Babich's reasonable attorney's fees and costs incurred by counsel chosen by Babich in connection with

negotiating and finalizing this Agreement, provided that such fees and costs do not exceed $10,000.

       (j)    *COBRA Reimbursement.* If Babich allows the release herein to become effective in accordance with its terms and this Agreement is still in full force and effect, then Babich shall be entitled to the reimbursement of an amount equal to Babich's monthly COBRA premiums for a period to end upon the earlier of (18) eighteen months (the "**COBRA Period**"). The COBRA premiums shall be reimbursed by Insys after receipt from Babich of evidence of payment by Babich satisfactory to Insys.   Notwithstanding the foregoing, if Insys determines, in its sole discretion, that it cannot pay the COBRA reimbursements without potentially incurring financial costs or penalties under applicable law (including, without limitation, Section 2716 of the Public Health Service Act), Insys instead shall pay to Babich, on the first day of each month of the remainder of the COBRA Period (regardless of if COBRA coverage is available to Babich), a fully taxable cash payment equal to the amount of Babich's monthly COBRA premiums.

2.    Release of Claims.

       (a)    In exchange for the consideration provided in Section 1 of this Agreement, Babich and his heirs, executors, administrators and assigns (collectively the "**Releasors**") forever waive, release and discharge the Insys Group from any and all claims, demands, causes of actions, fees, damages, liabilities and expenses (inclusive of attorneys' fees) of any kind whatsoever, whether known or unknown, that Babich has ever had against the Insys Group by reason of any actual or alleged act, omission, transaction, practice, conduct, occurrence or other matter up to and including the Separation Date, including, but not limited any claims under:

- Title VII of the Civil Rights Act, as amended;
- the Civil Rights Act of 1991, as amended;
- the Arizona Civil Rights Act;
- the Arizona Employment Protection Act;
- the Americans with Disabilities Act, as amended;
- the Family and Medical Leave Act, as amended;
- the Fair Labor Standards Act;
- the Equal Pay Act, as amended;
- the Employee Retirement Income Security Act, as amended (with respect to unvested benefits);
- The Labor Management Relations Act;
- The National Labor Relations Act;
- Section 1981 of U.S.C. Title 42;
- the Sarbanes-Oxley Act of 2002, as amended;
- the Older Workers Benefit Protection Act;
- the Worker Adjustment and Retraining Notification Act, as amended;
- the Age Discrimination in Employment Act, as amended;
- the Uniform Services Employment and Reemployment Rights Act, as amended;
- ALL STATE AND LOCAL STATUTES THAT MAY BE LEGALLY WAIVED THAT EMPLOYEES COULD BRING EMPLOYMENT CLAIMS UNDER, INCLUDING ANY STATE OR LOCAL ANTI-DISCRIMINATION STATUTE, WAGE AND HOUR STATUTE, LEAVE STATUTE, EQUAL PAY STATUTE AND WHISTLEBLOWER STATUTE and/or any other Federal, state or local law (statutory, regulatory or otherwise) that may be legally waived and released; and

4

- any tort and/or contract claims, including any claims of wrongful discharge, defamation, emotional distress, tortious interference with contract, invasion of privacy, nonphysical injury, personal injury or sickness or any other harm.

However, this general release of claims excludes the filing of an administrative charge or complaint with the Equal Employment Opportunity Commission or other administrative agency, although Babich waives any right to monetary relief related to such a charge. This general release of claims also excludes any claims made under state workers' compensation or unemployment laws, and/or any claims which cannot be waived by law.

(b)    This Agreement may be used by the Insys Group to completely bar any action or suit before any court, arbitral, or administrative body, other than with respect to any claim relating to the obligations under this Agreement. Furthermore, Babich specifically agrees that, except as set forth herein, he will not be entitled to any further payment of any kind from Insys or its board of directors.

(c)    Babich represents and warrants that he is the sole and lawful owner of all right, title and interest in and to every claim and other rights that are being released above and that no other party has received any assignment or other right of substitution or subrogation to any such claim or right. Babich also represents that he has the full power and authority to enter into the waivers and releases set forth in this Agreement. With respect to the foregoing release, Babich hereby waives all rights or protection under law of any state, territory, country or any political division thereof, to the extent applicable, which purports to restrict or govern the granting of waivers and releases (such foregoing language is not intended to indicate that the law of any jurisdiction other than Arizona is applicable to this Agreement).  For the sake of clarity, to the extent the law permits Babich to file or otherwise pursue on his behalf any charge, complaint or claim against Insys or the Insys Group, Babich expressly agrees to waive, forfeit or otherwise forgo any monetary damages, including but not limited to compensatory damages, punitive damages, any statutory share of the damages and/or penalties imposed on Insys or the Insys Group and attorneys' fees, to which Babich may otherwise be entitled in connection with said charge, complaint or claim.

3.    <u>Restrictive Covenants</u>.

(a)    *Confidentiality.* Babich understands and acknowledges that during the course of employment by the Insys, he has had access to and learned about confidential, secret and proprietary documents, materials and other information, in tangible and intangible form, of and relating to the Insys Group and its businesses and existing and prospective customers, suppliers, investors and other associated third parties ("**Confidential Information**"). Babich further understands and acknowledges that this Confidential Information and the Insys Group's ability to reserve it for the exclusive knowledge and use of the Insys Group is of great competitive importance and commercial value to the Insys Group, and that improper use or disclosure of the Confidential Information by Babich might cause the Insys Group to incur financial costs, loss of business advantage, liability under confidentiality agreements with third parties, civil damages and criminal penalties.

For purposes of this Agreement, Confidential Information includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques,

5

agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists of the Insys Group or its businesses or any existing or prospective customer, supplier, investor or other associated third party, or of any other person or entity that has entrusted information to the Insys in confidence.

Babich understands that the above list is not exhaustive, and that Confidential Information also includes other information that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

Babich understands and agrees that Confidential Information developed by him in the course of his employment by the Insys shall be subject to the terms and conditions of this Agreement as if the Insys furnished the same Confidential Information to Babich in the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to Babich, provided that such disclosure is through no direct or indirect fault of Babich or person(s) acting on Babich's behalf.

*(b)    Acknowledgment.* Babich understands that the nature of his position has provided him access to and knowledge of Confidential Information and placed him in a position of trust and confidence with the Insys Group. Babich understands and acknowledges that the intellectual and technical services he provided to the Insys Group are unique and extremely valuable because of his experience in the industry and the growth trajectory of the Insys Group during his employment.

Babich further understands and acknowledges that the Insys Group's ability to reserve these for the exclusive knowledge and use of the Insys Group is of great competitive importance and commercial value to the Insys Group, and that improper use or disclosure by Babich is likely to result in unfair or unlawful competitive activity.

*(c)    Disclosure and Use Restrictions.*

Babich agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate or make available Confidential Information, or allow it to be disclosed, published, communicated or made available, in whole or part, to any entity or person whatsoever (including other employees of the Insys Group) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Insys Group and, in any event, not to anyone outside of the direct employ of the Insys Group except with the prior consent of an authorized officer acting on behalf of the Insys Group in each instance (and then, such disclosure shall be

made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media or other resources containing any Confidential Information, or remove any such documents, records, files, media or other resources from the premises or control of the Insys Group, except with the prior consent of an authorized officer acting on behalf of the Insys Group in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent). Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation or order. Babich shall promptly provide written notice of any such order to an authorized officer of the Insys Group.

     *(d)    Duration of Confidentiality Obligations.* Babich understands and acknowledges that his obligations under this Agreement with regard to any particular Confidential Information shall commence immediately and shall continue during and after his employment by Insys until such time as such Confidential Information has become public knowledge other than as a result of Babich's breach of this Agreement or breach by those acting in concert with Babich or on Babich's behalf.

     *(e)    Non-Competition.* Babich acknowledges and re-affirms the non-compete obligations set forth in Section 1.6 of his Employment Agreement. For the sake of clarity, the Parties hereto agree that the one (1) year covenant to not compete commences on the Separation Date and shall end on the last day of the twelfth (12th) month thereafter.

     *(f)    Adherence to Proprietary Agreement.* Babich agrees to abide by the Insys Proprietary Information and Inventions Agreement he executed with Insys.

4.    <u>Knowing and Voluntary Acknowledgement</u>. Babich specifically agrees and acknowledges that: (a) Babich has read this Agreement in its entirety and understands all of its terms; (b) Babich has been advised of and has availed himself of his right to consult with his attorney prior to executing this Agreement; (c) Babich knowingly, freely and voluntarily assents to all of its terms and conditions including, without limitation, the waiver, release and covenants contained herein; Babich is executing this Agreement, including the waiver and release, in exchange for good and valuable consideration in addition to anything of value to which he is otherwise entitled; (d) Babich is not waiving or releasing rights or claims that may arise after his execution of this Agreement; and that (e) Babich understands that the waiver and release in this Agreement is being requested in connection with the cessation of his employment with Insys.

     Babich further acknowledges that he has had twenty-one (21) days to consider the terms of this Agreement, although he may sign it sooner if desired. Further, Babich shall have an additional seven (7) days from the date on which he signs this Agreement to revoke consent to his release of claims under the ADEA by delivering notice of revocation to Human Resources Director, at Insys Therapeutics, Inc., 1333 South Spectrum Blvd. Chandler, AZ 85286, with a copy to the General Counsel at the same address, before the end of such seven-day period. In the event of such revocation by Babich, Insys shall have the option of treating this Agreement as null and void in its entirety.

     This Agreement shall not become effective, if at all, until the eighth (8th) day after Babich and Insys execute this Agreement (and assuming Babich does not revoke his release of claims provided hereunder during the preceding seven day period pursuant to a notice described directly above). Such date shall be the "**Effective Date**" of this Agreement. ***No payments due***

*to Babich hereunder or benefits specified by this Agreement shall be made or begin before the Effective Date.*

5.    Non-Disparagement. Babich agrees and covenants that he will not at any time make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments or statements concerning the Insys Group or the Insys Group's businesses and existing and prospective customers, suppliers, investors and other associated third parties, now or in the future. Insys agrees and covenants that it will not at any time make, publish or communicate to any person or entity or in any public forum any defamatory or disparaging remarks, comments or statements concerning Babich, now or in the future.

        This Section does not, in any way, restrict or impede Babich or Insys from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation or order. Babich shall promptly provide written notice of any such order to the General Counsel of Insys.

6.    Restrictive Covenant Remedies. In the event of a breach or threatened breach by Babich of any of the relevant provisions of this Agreement, Babich hereby consents and agrees that the Insys Group shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages or other available forms of relief.

7.    Successors and Assigns.

        (a)    *Assignment by the Insys Group.*

                To the extent permitted by state law, the Insys Group may assign this Agreement to any subsidiary or corporate affiliate in the Insys Group. This Agreement shall be automatically binding upon and inure to the benefit of or to any successor or assign (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Insys Group.

        (b)    *No Assignment by Babich.*

                Babich may not assign this Agreement or any part hereof. Any purported assignment by Babich shall be null and void from the initial date of purported assignment.

8.    Governing Law. This Agreement, for all purposes, shall be construed in accordance with the laws of Arizona without regard to conflicts-of-law principles.

9.    Entire Agreement. Unless specifically provided herein, this Agreement contains all the understandings and representations between Babich and the Insys Group pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter. The Parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement. In the event of

any inconsistency between the statements in the body of this Agreement and the Employment Agreement, the statements in the body of this Agreement shall control and, other than as expressly provided hereunder, Babich hereby unconditionally waives and forfeits any other compensation he may be entitled to from the Insys Group.

10.    Modification and Waiver. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by Babich and by an authorized officer of the Insys Group. No waiver by either of the Parties of any breach by the other Party hereto of any condition or provision of this Agreement to be performed by the other Party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the Parties in exercising any right, power or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power or privilege.

11.    Severability. Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the Parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement.

The Parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement or by making such other modifications as it deems warranted to carry out the intent and agreement of the Parties as embodied herein to the maximum extent permitted by law.

The Parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had not been set forth herein.

12.    Arbitration and Jurisdiction and Venue. Any controversy relating to this Agreement or relating to the breach hereof will be settled by arbitration conducted in Phoenix, Arizona in accordance with the Employment Arbitration Rules of the American Arbitration Association then in effect. The award rendered by the arbitrator(s) will be final and judgment upon the award rendered by the arbitrator(s) may be entered upon it in any court having jurisdiction thereof. The arbitrator(s) will possess the powers to issue mandatory orders and restraining orders in connection with such arbitration. The expenses of the arbitration will be borne by the losing party unless otherwise allocated by the arbitrator(s). This agreement to arbitrate will be specifically enforceable under the prevailing arbitration law. During the continuance of any arbitration proceedings, the parties will continue to perform their respective obligations under this Agreement. Nothing in this Agreement will preclude Insys or any affiliate or successor from seeking equitable relief, including injunction or specific performance, in any court having jurisdiction, in connection with any obligations of confidentiality or under a covenant not to compete. Any action or proceeding by either of the Parties to enforce the obligations of confidentiality, covenant not to compete and non-disparagement shall be brought only in any state or federal court located in the state of Arizona, County of Maricopa. The Parties hereby

irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue.

13.    Captions. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

14.    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.  Any photocopy, facsimile or electronic reproduction of the executed Agreement shall constitute an original.

15.    Tolling. Should Babich violate any of the terms of the restrictive covenant obligations articulated herein, the obligation at issue will run from the first date on which Babich ceases to be in violation of such obligation.

16.    Attorneys' Fees. Should either Party breach this Agreement, to the extent permitted by state law, the prevailing party will be responsible for payment of all reasonable attorneys' fees and costs that the prevailing party incurred in the course of enforcing the terms of the Agreement, including demonstrating the existence of a breach and any other contract enforcement efforts.

17.    Notice. Babich agrees to notify any subsequent employer of the restrictive covenants section contained in this Agreement. In addition, Babich authorizes the Insys Group to provide a copy of the restrictive covenants section of this Agreement to third parties, including but not limited to, Babich's subsequent, anticipated or possible future Insys.

18.    Section 409A. The severance benefits and other payments payable under this Agreement are intended to qualify for an exemption from application of Section 409A of the Code and any state law of similar effect (collectively "**Section 409A**") or comply with its requirements to the extent necessary to avoid adverse personal tax consequences under Section 409A, and any ambiguities herein shall be interpreted accordingly. Severance benefits shall not commence until Babich has a "separation from service" for purposes of Section 409A. Each installment of severance benefits is a separate "payment" for purposes of Treas. Reg. Section 1.409A-2(b)(2)(i), and the severance benefits are intended to satisfy the exemptions from application of Section 409A provided under Treasury Regulations Sections 1.409A-1(b)(4), 1.409A-1(b)(5) and 1.409A-1(b)(9). However, if such exemptions are not available and Babich is, upon separation from service, a "specified employee" for purposes of Section 409A, then, solely to the extent necessary to avoid adverse personal tax consequences under Section 409A, the timing of the severance benefits payments shall be delayed until the earlier of (i) six (6) months and one day after Babich's separation from service, or (ii) Babich's death.  Furthermore, in the event the severance benefits are not covered by one or more exemptions from the application of Section 409A and the Effective Date could become effective in the calendar year following the calendar year in which Babich's separation from service occurs, solely for purposes of timing of severance benefits, the Effective Date will not be deemed to occur in the calendar year in which Babich's separation from service occurs.

19.    Acknowledgment of Full Understanding. BABICH ACKNOWLEDGES AND AGREES THAT HE HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. BABICH ACKNOWLEDGES AND AGREES THAT HE HAS HAD AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF HIS

CHOICE BEFORE SIGNING THIS AGREEMENT. BABICH FURTHER ACKNOWLEDGES THAT HIS SIGNATURE BELOW IS AN AGREEMENT TO RELEASE INSYS FROM ANY AND ALL CLAIMS.

**IN WITNESS WHEREOF**, the Parties have executed this Separation Agreement as of the Execution Date above.

**INSYS THERAPEUTICS, INC**.

Name: DARRYL S BAKER
Title: CFO

**MICHAEL BABICH**

Signature

11

CHOICE BEFORE SIGNING THIS AGREEMENT. BABICH FURTHER ACKNOWLEDGES THAT HIS SIGNATURE BELOW IS AN AGREEMENT TO RELEASE INSYS FROM ANY AND ALL CLAIMS.

**IN WITNESS WHEREOF**, the Parties have executed this Separation Agreement as of the Execution Date above.

**INSYS THERAPEUTICS, INC.**

Name:
Title:

**MICHAEL BABICH**

Signature

# EXHIBIT 3



**GRANTED**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| WILLIAM H. HENRICH, as<br>Trustee of the Insys Liquidation Trust,<br><br>          Plaintiff,<br><br>  v.<br><br>JOHN N. KAPOOR,<br>MICHAEL L. BABICH,<br>PATRICK P. FOURTEAU,<br>PIERRE LAPALME,<br>STEVEN MEYER,<br>BRIAN TAMBI, and<br>THEODORE H. STANLEY,<br><br>          Defendants. | C.A. No. 12696-JTL |

**[PROPOSED] ORDER GRANTING APPLICATION FOR ARBITRATION
AND STAY PENDING DECISION BY ARBITRATOR**

WHEREAS, on August 11, 2023, Defendant Michael L. Babich ("Defendant Babich") filed an Application to Compel Arbitration ("Application") (Dkt. 248);

WHEREAS, on August 25, 2023, Plaintiff William H. Henrich, as Liquidating Trustee of the Insys Liquidation Trust, the successor to Insys Therapeutics, Inc. ("Plaintiff") filed its Opposition to the Application ("Opposition") (Dkt. 249);

WHEREAS, on September 8, 2023, Defendant Babich filed his Reply in support of the Application ("Reply") (Dkt. 255); and

WHEREAS, on November 16, 2023, the Court conducted argument on the

1

Application.

NOW THEREFORE, having considered the Application, Opposition and Reply, as well as the arguments of counsel, and the Court having found good cause to grant the Application as more fully detailed in the transcript of the hearing held on November 16, 2023,

IT IS HEREBY ORDERED that:

(a)    The Application is GRANTED;

(b)    This case is STAYED against Defendant Babich pending a decision by an arbitrator regarding whether the claims asserted by Plaintiff in this case against Defendant Babich are subject to arbitration;

(c)    If the arbitrator determines that the claims against Defendant Babich are arbitrable, then the claims against Defendant Babich will be dismissed in favor of arbitration and the Plaintiff and Defendant Babich shall so stipulate to this Court to allow for the entry of an order dismissing Defendant Babich upon such determination by the arbitrator;

(d)    If the arbitrator determines that the claims against Defendant Babich are not arbitrable, the parties shall advise the Court and this stay will be lifted promptly; and

2

(e)    This stay does not affect any other aspect of these proceedings.

It is SO ORDERED this _____ day of _____, 2023

_____
The Honorable J. Travis Laster

This document constitutes a ruling of the court and should be treated as such.

| | |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | J Travis Laster |
| **File & Serve Transaction ID:** | 71477183 |
| **Current Date:** | Nov 27, 2023 |
| **Case Number:** | 12696-JTL |
| **Case Name:** | CONF ORD - Cons w/ 2017-0078-TMR - William H. Henrich, Trustee of the Insys Liquidation Trust v. John N. Kapoor et.al. |
| **Court Authorizer:** | J Travis Laster |

**/s/ Judge J Travis Laster**